FARMERS' LOAN & TRUST CO. v. TOLEDO & S. H. R. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. February 14, 1893.)

No. 49.

1. RAILROAD COMPANIES—SALE OF ROAD—RIGHTS OF STOCKHOLDERS—RES JUDICATA—WAIVER.

A railroad corporation, under authority of the Michigan statutes, (How. St. § 3403,) sold all its property and franchises to another corporation, and the purchaser mortgaged the same to secure an issue of bonds. A minority stockholder in the seller, having dissented from the sale, brought suit against both corporations to set it aside, which resulted in a decree upholding the sale, but providing that such stockholder, on tendering his stock to the purchasing company, should have a right to receive an equal number of shares in the purchaser, or to have an execution against the same for the value of his stock. He elected to take the latter course, and asked for the declaration of a lien prior to the mortgage, but this was denied. In a subsequent suit to foreclose the mortgage, he intervened, claiming an equitable lien prior thereto for the value of his stock. *Held,* that the effect of the former decree was to convert him from a stockholder in the selling corporation to a judgment creditor of the purchasing corporation, and that he had no lien as claimed. Jackson, J., was of the opinion that the former proceeding was a waiver by the stockholder of any right he had to assert a lien. Taft, J., was of the opinion that the question of a lien was res judicata.

2. SAME—VALIDITY—CONSIDERATION.

Under the provisions of How. St. Mich. § 3403, for the sale of the property and franchises of one railroad company to another when authorized by a vote of two thirds of the stockholders, such a sale by a corporation organized after the enactment of the law is valid, and concludes a dissenting stockholder, although the terms of the sale provide for the payment in stock of the purchasing company. Taft, J., dissenting.

3. SAME—BONDS—LIS PENDENS.

A bona fide holder of negotiable corporation bonds is not subject to the general doctrine of lis pendens, and this applies even if they were purchased during the pendency of the suit in which its issue was finally declared invalid.

4. SAME—AUTHORITY TO PLEDGE BONDS.

A railroad company, by proper resolution under the provisions of How. St. Mich. § 3352, authorizing it, inter alia, to issue and dispose of bonds, etc., for the purpose of borrowing money, may pledge its bonds for money borrowed.

5. PLEDGE—SALE—PURCHASE BY PLEDGEE.

Where a pledgee of bonds makes a sale under and within the terms of the pledge, and purchases the pledge himself, such purchase is not, per se, void, but only voidable at the instance, and upon the objection, of the pledgor, or one in privity with him. Third parties and strangers have no right to question the sale or purchase, and in such a case the pledgee may recover the full value of the bonds, irrespective of the amount for which they were pledged.

Appeal from the Circuit Court of the United States for the Western District of Michigan.

In Equity. Suit by the Farmers' Loan & Trust Company against the Toledo & South Haven Railroad Company for foreclosure of a mortgage. Charles F. Young intervened, and claimed a lien upon the mortgaged property superior to that of the plaintiff. 43 Fed. Rep. 223. The circuit court sustained Young's claim, and allowed his lien. Plaintiff appeals. Reversed.

Charles H. Campbell, Henry Russel, and Henry M. Campbell, for appellant.

Dallas Boudeman and John W. Adams, for appellees.

Before JACKSON and TAFT, Circuit Judges, and HAMMOND, District Judge.

JACKSON, Circuit Judge. The appellant, as trustee or mortgagee under a trust deed or mortgage made and executed October 27, 1886, by the Toledo & South Haven Railroad Company, to secure the payment of its first mortgage coupon bonds, bearing 6 per cent. interest, to the amount of $216,000, of even date, brought this suit, at the instance and upon the demand of the holder of $210,000 of said bonds, to foreclose said mortgage; the mortgagor having made such default in the payment of the interest, warrants, or coupons on said bonds as entitled the holder of a majority thereof, under the terms of the trust deed, to declare the principal of the bonds to be due and payable, etc. The defendant railroad company was duly served, but made no defense to the suit. The appellee Charles F. Young intervened as a defendant, by leave of the court. He attacked the validity of the mortgage and bonds secured thereby, and claimed an equitable interest and incumbrance in, to, and upon the mortgaged property, to the extent of $3,500, with interest from December 28, 1889, which was prior and superior to the lien of said mortgage. The circuit court sustained the validity of the mortgage, and of the bonds issued by the railroad company, directed a sale of the rights, properties, etc., covered by the mortgage, and decreed that said Young was entitled to priority of payment out of the proceeds thereof to the extent of his said claim for $3,500, and interest thereon. It was further adjudged that the First National Bank, as the holder of 210 of said railroad bonds, was not entitled to the full amount of same, and interest, but only to its debt, for which said bonds were originally pledged as collateral, as hereinafter explained. The complainant has appealed from so much of said decree as awards Young this priority of payment, and denies the right of said national bank to recover the principal and interest of the 210 bonds it holds. In both of these respects it is claimed that the decree below was erroneous.

The claim of said Young, which was given preference of satisfaction out of the proceeds of the mortgaged property, grew out of the following transactions and proceedings: The Paw Paw Railroad Company, a Michigan corporation, organized under the general laws of said state, extended from the village of Lawton to Paw Paw,—a distance of four miles. Its capital stock consisted of 750 shares of $100 each. The Toledo & South Haven Railroad Company, another Michigan corporation, extended from Lawton to South Haven, as completed,—a distance of 36 miles. In 1878 the Paw Paw Railroad Company leased its roadbed, etc., to the Toledo & South Haven Railroad Company at a rental of 8 per cent. on $30,000, or 40 per cent. of the par value of the stock in the lessor company. While this lease was in force the two companies, with a view to their consolidation, entered into a written contract with the appellee Young,

bearing date June 21, 1884, by which he undertook, for a specified consideration, to dispose of the securities of the Toledo & South Haven Railroad Company, the proceeds of which were in part to be used and employed in purchasing the interests of parties in the Paw Paw Company for the benefit of the Toledo & South Haven Railroad Company, in order to effect the desired and contemplated merger of the two companies. In August following this contract was partially modified in respect to his compensation for what he might accomplish, and he was thereafter in the employ of said companies, to aid in the accomplishment of the general result contemplated, viz. that of uniting the two corporations into one. It appears that only 730 shares of the capital stock of the Paw Paw Railroad Company were actually issued, leaving 20 shares not issued, and that several of the holders of said issued shares were also stockholders in the Toledo & South Haven Railroad Company. Of the outstanding stock in the Paw Paw Company, 75 shares were, in August, 1875, issued to one George W. Longwell, the certificate for which, numbered 114, recited upon its face that said shares were "transferable only on the books of said company, by the holder thereof, in person or by attorney, on surrender of this certificate." Said Longwell, by written indorsement on said certificate under date of April 3, 1884, transferred and assigned said 75 shares to J. Riley Bang, who in February, 1886, transferred and assigned the certificate and shares to Thomas Welch, and said Welch on September 6, 1886, by a similar indorsement on the same certificate, transferred and assigned said 75 shares to the appellee Young. Neither of said transfers appears to have been registered on the stock book of the company, nor was the company notified by Young of the transfer thereof made by Welch to him. On September 9, 1886, three days after Young's acquisition of said certificate, a meeting of the stockholders of the Paw Paw Railroad Company was held, at which a resolution was passed, accepting a proposition of the Toledo & South Haven Railroad Company, that day made, for the purchase of the property and franchises of the former company. The proposition to purchase was duly authorized by the stockholders of the Toledo & South Haven Railroad Company, and the consideration offered and accepted was the full-paid stock of the purchasing company to an amount equal to the outstanding stock of the Paw Paw Company, which was to procure its stock to be transferred to the former, and in exchange therefor give to the stockholders of the latter an equal amount of the paid-up stock of the purchasing company. "It appearing to be for the manifest interest of this company [the Paw Paw Railroad Company] to make such sale at the price and on those terms," the stockholders formally accepted the proposition to buy, and authorized the directors of the company to consummate the sale. At the meeting which authorized this sale, 655 shares of the 730 shares outstanding were represented, and voted unanimously for the sale. The minutes of the meeting show, as "not represented, Thos. Welch, holding 75 shares." It appears that neither said Welch nor defendant Young had any formal notice of said meeting, which was not attended by either of them. Under and in pursuance of said resolution, its directors on the same day, September

9, 1886, by deed duly executed, conveyed and transferred all the property, rights, and franchises of the Paw Paw Railroad Company to the Toledo & South Haven Railroad Company. This deed, which was properly acknowledged and filed for record on the day of its execution, recited that, at the meeting of the stockholders which authorized it, "all the stockholders, except 75 shares, of said party of the first part, were present in person or by proxy," and duly sanctioned and directed the sale and conveyance. The purchasing company turned over to the vendor company 730 shares of its paid-up capital stock, as the consideration agreed to be paid for the property, etc., conveyed. In pursuance of authority duly conferred by the stockholders, the Toledo & South Haven Railroad Company, on October 27, 1886, executed the trust deed to complainant upon its property, etc., including that purchased from the Paw Paw Company, to secure the payment of its 216 first mortgage bonds. In January, 1887, before the bonds of said railroad company thus secured had been actually negotiated, but while held by the complainant as trustee in New York, the intervening defendant, Young, filed his bill in the circuit court for Van Buren county, Mich., against the Toledo & South Haven Railroad Company, the Paw Paw Railroad Company, and the complainant herein, setting forth his ownership of said 75 shares in the Paw Paw Company; that he had no notice of the meeting of its stockholders held on September 9, 1886; that he was unwilling to accept the stock of the purchasing company for his stock in the vendor company; and alleging that the proceedings resulting in the sale of the Paw Paw Company's property, etc., to the Toledo & South Haven Railroad Company, were, under the general facts already stated, illegal and void; that the mortgage made by the purchasing company to the trustee communicated no valid title to or right in the property, etc., attempted to be sold and conveyed by the Paw Paw Company, which he claimed was a completed railroad, and therefore had no authority or power, under the laws of Michigan, to make said sale, etc., and prayed that the sale might be declared void, as contrary to his rights; that the deed of trust executed to secure the bonds of the vendee company might also be declared void, and the negotiations of said bonds be restrained; and that the Toledo & South Haven Railroad Company be decreed to reconvey to the Paw Paw Railroad Company the property, etc., which the latter attempted to sell and convey to the former. The two railroad companies were duly served with process. The Toledo & South Haven Railroad Company alone appeared and made defense. The Farmers' Loan & Trust Company did not appear, and was not served, otherwise than by publication. It had no actual notice of the proceeding. The circuit court of Van Buren county rendered a decree in Young's favor, from which the Toledo & South Haven Railroad Company appealed to the supreme court of the state, which reversed the decree of the court below. By reference to the opinion of said supreme court, (Young v. Railroad Co., 76 Mich. 485–497, 43 N. W. Rep. 632,) it will be seen that said court held that the Paw Paw Railroad Company was an uncompleted road, within the true meaning of section 3403, How. St.; that under said section it had the authority to make the sale of its property

and franchises to the Toledo & South Haven Railroad Company, and that the proceedings already referred to, which are fully set out in said opinion, showed and established a legal sale of the Paw Paw Railroad to the Toledo & South Haven Railroad Company. It was further held by said supreme court that said Young's relations to the two contracting companies, and his knowledge of their contemplated union, was such that he was not in a position to disturb the transaction, and that the most that he "could claim, under the circumstances, in equity and justice, against the company, would be what the defendant [the Toledo & South Haven Railroad Company] offered to pay him, stated in the answer to complainant's bill, viz. the fair value of the 75 shares of stock at the time the Toledo & South Haven Company purchased the Paw Paw Railroad." Chief Justice Sherwood, speaking for the court, further states:

"I can discover no fraud, or any attempt to defraud the complainant, on the part of the company [the Toledo & South Haven Railroad Company] answering the bill; but all the circumstances, I think, quite clearly show a want of good faith in the demands made by the complainant upon the Toledo & South Haven Railroad Company."

It was further held by the court that, inasmuch as he had never, in a legal way, consented to the mode of payment provided by the terms of sale and purchase, "equity and justice require that he should transfer to said company his 75 shares upon receiving or being tendered the value of the same at the time the company made its purchase," which value was ascertained and fixed at $3,500, and allowed him, or, in lieu thereof, gave him the liberty of electing to surrender his shares, and take an equal number or amount of stock in the Toledo & South Haven Railroad Company. Before the decree of the supreme court was settled and entered in accordance with this opinion, Young, through his attorneys, applied to said court to have a lien declared and adjudged in his favor upon the railroad and other property of the defendant company for said sum of $3,500. In his affidavit filed in support of said application, he refers to the fact that the said company had in its answer offered to pay him what his stock was worth, which the court had fixed at $3,500; that the company had, since the commencement of the suit, assigned and disposed of all or the greater part of said $216,000 worth of bonds, as he was informed and believed; that such transfer was invalid, etc., and that, if the same was "allowed to stand, and have precedence over defendant's claim in this cause, that his said claim will be valueless," etc. The supreme court did not, however, by its decree, allow him the lien applied for. In said decree it is recited that, "said Young having elected not to take and accept stock in the corporation of the said Toledo & South Haven Railroad Company, it is further ordered and adjudged that upon being tendered by said corporation the sum of $3,500, within 30 days from the entry of the decree, said Charles F. Young shall assign his said stock to the Toledo & South Haven Railroad Company." The tender of the $3,500 was not made by the railroad company, and thereafter Young gave said company written notice that upon a designated day he would present his motion to said supreme court,

asking for the issuance of an execution in his favor against the Toledo & South Haven Railroad Company for said sum of $3,500 This motion he supported by affidavit of having made tender of said 75 shares of stock to the representatives of the company, with the offer to assign and transfer the stock upon payment of the $3,500, which was not complied with. Upon the hearing of said motion the supreme court entered the following judgment:

"It is hereby ordered, adjudged, and decreed, as supplemental to said former decree, that the defendant do pay to said complainant the sum of $3,500 within 30 days after complainant shall have tendered to said defendant a written assignment of said 75 shares of stock, duly executed, so as to pass the title to said stock to said defendant; and in default of such payment for 30 days after said tender of said stock duly assigned, as aforesaid, the complainant, upon filing due proof of such tender with the clerk of this court, has leave to issue execution against defendant for the collection of said sum of $3,500, provided said assignment of stock shall be tendered to said defendant within 30 days from the date of this decretal order."

Within the time allowed, the said Young made the required tender of the stock to the railroad company, and demanded payment of the $3,500, which the said company failed to pay within the time allowed; and thereafter said Young, having made proof before the clerk of said court of said facts, applied for, and caused to be issued to the sheriff of Van Buren county, an execution in his favor against the goods, chattels, real estate, and property of the Toledo & South Haven Railroad Company, to enforce the collection of said sum of $3,500, which execution was by said sheriff levied upon the property of said company on June 16, 1890, after the present bill had been filed, and after a receiver had been appointed. Being unable to proceed with his execution, Young thereupon intervened in the foreclosure proceeding as a defendant, and in his answer sets up substantially the same claims which he asserted in his suit in the state court, and seeks to invalidate the sale of the Paw Paw Railroad to the Toledo & South Haven Railroad Company, and the mortgage made by the latter, upon substantially the same grounds relied on in the state suit. By his answer he practically attempts to relitigate with the complainant all the questions involved and settled by the decision of the Michigan supreme court.

The court below, while properly conceding that complainant was entitled to the benefit of the state decision, and that Young was thereby concluded from attacking the sale by the Paw Paw Company to the Toledo & South Haven Company, and the mortgage made by the latter to the complainant, which was declared valid, reached the conclusion that the effect of the decree of the state supreme court was that Young remained a stockholder in the Paw Paw Railroad Company, with all his rights as such, until the value of his 75 shares, as fixed, was actually paid; that the payment of such valuation, and his transfer and surrender of his stock to the Toledo & South Haven Railroad Company were to be concurrent acts, and that, inasmuch as such payment had not been made, the court could not rightfully sell the property covered by the mortgage sought to be foreclosed "without providing that the amount due to the defendant Young for the share he contributed to its value shall

be first paid." The decree accordingly directed that he should be first paid out of the proceeds of the entire mortgaged property. The priority thus given said Young is manifestly erroneous. Upon the theory that, notwithstanding the supreme court's decree, he remained a stockholder in the Paw Paw Company, what right had Young, as such stockholder, to priority of payment out of the railroad and property of the Toledo & South Haven Company covered by the mortgage, and which had not been purchased or acquired from the Paw Paw Railroad Company? He certainly had none. If he is regarded as a judgment creditor of the Toledo & South Haven Railroad Company under the decree of the Michigan supreme court, it is equally clear that he is not entitled, as such, to priority over the mortgage previously made and duly recorded, as against bona fide holders of the bonds secured by said mortgage. The lower court seems to have construed the original and supplemental decree of the supreme court as having simply, or in effect, found and fixed the value of the 75 shares, and then given Young the election to accept that valuation for the same, if paid by the Toledo & South Haven Railroad Company, or to take an equal amount of stock in the last-named company.

We do not think that this is the proper construction to be placed upon the supplemental decree, when read and considered in the light of the court's opinion. The defendant railroad had in its answer offered to pay Young the value of his 75 shares. But for this offer he had no right to a personal judgment against that company. The opinion declared that the value of his stock was all that he was equitably entitled to, as against said defendant, and fixed said value at $3,500. By the original decree, Young, having made his election not to take an equal amount of stock in defendant's corporation, was required, upon being tendered said sum within 30 days by the company, to assign and transfer the stock. Under this decree the defendant was to be the actor in performing the condition or prerequisite of acquiring the right to the stock. It, however, failed to make tender of the amount, and Young, having himself tendered a transfer of the stock, and demanded payment of its ascertained value from the agents of the railroad company, then moved the court for execution against it for said sum of $3,500. No such execution could have been awarded, under the terms of the decree as it then stood. In order to grant his application for execution, it was necessary to render a new decree; and the court thereupon "ordered, adjudged, and decreed, as supplemental to said former decree, that the defendant do pay to said complainant the sum of $3,500 within 30 days after said complainant shall have tendered to said defendant a written assignment of said 75 shares of stock," and further provided that, in default of such payment for 30 days after such tender, the complainant, upon filing proof thereof with the clerk of the court, "has leave to issue execution against defendant for the collection of said sum of $3,500. Young made the required tender of the stock. The defendant did not pay the amount within 30 days thereafter. Young filed proof of those facts with the clerk of the court, and applied for and obtained an execution against the

defendant for the collection of the sum which the latter was ordered, adjudged, and decreed to pay him on the conditions he had complied with, and the execution was actually levied by the sheriff to whom it was issued. If this does not, in legal effect and operation, amount to an absolute personal judgment against the railroad company for the value of said stock, voluntarily and intentionally taken by Young, it is difficult to understand what can be regarded as such a judgment. How can Young, after taking a personal decree of this character against a defendant who was not his debtor, otherwise than by having offered to buy and pay for his stock at valuation, and after making a tender of the specific shares to the defendant as a prerequisite to the obtaining of such judgment, be still treated as a continuing stockholder in the Paw Paw Railroad Company? He certainly made his election of remedies in taking the personal judgment against the defendant, even regarding the latter as a wrongdoer; and his tender of the specific shares in order to obtain such personal judgment for the value thereof operated to pass the title to the stock to the defendant, or place Young thereafter in the position of a trustee or bailee of the stock for the Toledo & South Haven Railroad Company. If he desired or intended to retain the beneficial ownership of the 75 shares of stock, with such rights and remedies as were incidental to such ownership, he should not have tendered a transfer thereof, and taken a personal judgment for its value. After pursuing this course, he cannot, upon well-settled principles, be allowed to subsequently pursue remedies inconsistent with that previously taken. May v. Le Claire, 11 Wall. 217; Lamb v. Lathrop, 13 Wend. 97, 98; Hooker v. Hubbard, 97 Mass. 177; Goss v. Mather, 46 N. Y. 689; Sanger v. Wood, 3 Johns. Ch. 416–421; Foundry Co. v. Hersee, 103 N. Y. 25, 9 N. E. Rep. 487; Conrow v. Little, 115 N. Y. 387, 22 N. E. Rep. 346; Sloan v. Holcomb, 29 Mich. 161; Pom. Rem. (2d Ed.) §§ 567–569; and 2 Herm. Estop. § 1045.

It is not claimed by Young, in his answer herein, that he did not make said election with a full knowledge of all the facts now possessed and relied upon by him. We are of the opinion that said state suit, and decree of the supreme court therein, which Young made a part of his answer, and introduced in evidence, operated to convert him from a stockholder in the Paw Paw Company to a judgment creditor of the Toledo & South Haven Railroad Company, with rights and lien subordinate to those of the trustees and beneficiaries under the mortgage made and executed October 27, 1886, by the Toledo & South Haven Railroad Company. But suppose it be conceded that the legal effect of the state suit, and the decree of the Michigan supreme court therein, did not establish the validity of the sale by the Paw Paw Railroad Company to the Toledo & South Haven Railroad Company, and that, notwithstanding said proceedings and decrees, Young continued to be the beneficial owner of the 75 shares of stock in the Paw Paw Company. Upon what principle can it be maintained that his rights or interests as such stockholder entitle him to priority of payment even out of the proceeds of that corporation's property for the fixed value of his stock.

as against the complainant herein, and the bona fide holders of mortgage bonds whom it represents? It cannot be questioned that the supreme court of Michigan reversed the decree of the Van Buren circuit court, holding that the sale and mortgage were void. It is equally clear that said supreme court declared, as is clearly shown in this case, that the sale of the Paw Paw Railroad to the Toledo & South Haven was duly authorized by two thirds of the stockholders of the vendor company, (it appearing that, of the 730 shares outstanding, there were present at the stockholders' meeting which assented to and directed the sale 655 shares, which sanctioned the same unanimously,) as required by the law of Michigan (How. St. § 3403) in force when the corporation was organized, and when the transactions in question took place. Said section expressly empowered the Paw Paw Railroad Company to make the sale, "provided, that, at a general or special meeting duly called for that purpose, the stockholders carrying [owning] two thirds ($\frac{2}{3}$) of the stock of said company shall consent thereto."

It was also found by the supreme court of Michigan—and there is nothing in the present case, in the shape of newly-discovered evidence or otherwise, to change our opinion as to the correctness of that finding—that there was no fraud, or any attempt to defraud Young, on the part of the purchasing company. Now the question is whether a minority and nonassenting stockholder in a railroad company, which has lawfully sold and conveyed its road and franchises to another railroad company, is entitled to have the value of his stock paid out of the property so conveyed, as against the mortgagee of the purchasing company. In other words, when corporate property and franchises have been transferred and conveyed to another corporation, under charter power or legislative authority in existence when the corporation is organized, and the purchasing corporation has mortgaged the property thus acquired to secure its negotiable bonds, which pass into the hands of bona fide holders, can a single or minority stockholder in the vendor corporation, who did not assent to such sale, assert a right to or interest in the corporate property so conveyed, paramount and superior to that of such mortgage, and the bonds thereby secured? Could Young, in the present case, have restrained, before its consummation, the sale and conveyance which more than two thirds of his costockholders had sanctioned and assented to? Clearly not. It is settled that equity will enjoin a corporation and its officers, at the suit of a single stockholder, from entering into contracts or engaging in transactions which are in violation of law or the charter power of the company, or which involves a breach of trust injuriously affecting the rights of the complaining stockholder. "When the majority of the shareholders are oppressively and illegally pursuing a course, in the name of the corporation, which is in violation of the rights of other shareholders, and which can only be restrained by the aid of a court of equity," an injunction will be issued at the instance of a single stockholder. Hawes v. Oakland, 104 U. S. 460. Generally speaking, single or minority stockholders may restrain their associates or the corporation from the doing of ultra vires acts. It is

not necessary to go into the authorities on this subject, for the reason that the sale in question was authorized by a statute in existence when the vendor corporation was organized, and there was no illegal or ultra vires action on the part of the Paw Paw Railroad Company, or of its shareholders, in assenting to or in making the sale. If Young had been only a subscriber for 75 shares of the capital stock of the Paw Paw Railroad Company, it admits of little or no question that after the sale of its property, assets, and franchises to the Toledo & South Haven Railroad Company, under the Michigan statute, even against his objection, the latter company could have compelled him to pay for such shares. Nugent v. Supervisors, 19 Wall. 241-253, which established the principle that subscribers to the capital stock of corporations, and subsequent holders of such stock, must be regarded as having, in the very contract of subscription, assented to what was provided for or contemplated by either the charter itself, or the general law of the state under which the corporation is organized. The principle is illustrated and applied in the case of Railroad Co. v. Dudley, 14 N. Y. 337, etc. See, also, New Buffalo v. Iron Co., 105 U. S. 73, and Chickaming v. Carpenter, 106 U. S. 663, 1 Sup. Ct. Rep. 620. The fundamental principle applicable to such artificial bodies, created for the public good, and affected with a quasi public trust and duty, is that the majority of the stockholders, in the absence of express provision of law to the contrary, can regulate and control the lawful exercise of the powers conferred on a corporation by its charter, or the general law of the state in existence when the corporation is organized. In the creating or organization of corporations, there is ordinarily no contract between the state and the stockholders therein, any further than they are represented by the artificial body which the act of incorporation, whether by special or general law, calls into being. The corporation is not to be confounded with the stockholder. Each stockholder is bound to know that, within the scope of the corporate powers conferred by the charter, or by general law in force when the corporation is organized, he and his interests are subject to the control of the majority or other designated number of his costockholders. The individual stockholder takes or acquires his stock subject to the implied condition and understanding that what the charter or general law in existence when the corporation is organized permits and authorizes may take place, without or against his assent, if sanctioned by the prescribed majority of his associates. In respect to acts and transactions thus previously authorized, each stockholder is represented by the corporation and his costockholders. This is one of the implied terms of his contract of subscription with the corporation. These general propositions are admirably stated more at large by Bigelow, C. J., in the case of Durfee v. Railroad Co., 5 Allen, 240-248.

It is a sound principle, and established by the authorities, that the requisite or prescribed majority in interest in common property of indivisible nature, consecrated to public use, may, within the limits of legislative power previously conferred, so use or dispose of that property as to advance the private interests of such majority,

and secure the public welfare. The cases of Town of Middletown v. Boston, etc., R. Co., 53 Conn. 351, 5 Atl. Rep. 706, and Durfee v. Railroad Co., supra, furnish illustrations of the general rule and its application. The principle has been extended even to the case of the rights and interests of dissenting minority bondholders in Railroad Co. v. Gebhard, 109 U. S. 534–537, 3 Sup. Ct. Rep. 363, and Gates v. Railroad Co., 53 Conn. 333–335, 5 Atl. Rep. 695. In this case the Paw Paw Railroad Company had the right, by the law of Michigan, (section 3403, How. St.,) to make the sale of its railroad and franchises by and with the assent of two thirds of its stockholders. That assent having been duly given, the sale was made, and passed to the purchasing company, not only the legal title to the property conveyed, but the equitable interest and proportionate share therein of each and every stockholder in the vendor company; and, such transfer having been made in the exercise of lawful authority, the court cannot regard the effect of the sale as wrongful, or, in any correct and legal sense, as fraudulent.

The argument in behalf of Young's claim to priority of payment for the value of his stock involves the assertion or proposition that the sale, although valid as to the corporation, was invalid and void in respect to the proportionate interest in the corporate property represented by his 75 shares, because he never assented to the transaction. This contention is fallacious and untenable. Such a sale cannot be treated as legal and valid so far as the corporation and the interests it represents is concerned, and at the same time void as to a nonassenting stockholder. If valid as to the corporation, it must be equally valid as to Young, who has become a member of the Paw Paw Railroad Company under the implied agreement and understanding that the corporation, with the assent of two thirds of its shareholders, could make a valid sale and transfer of its property and franchises. There is nothing in the objection urged on behalf of the appellee, Young, that the trustee and holders of the bonds secured by the mortgage had actual or constructive notice, from the face of the conveyance to the mortgagor, and from the recital of the instruments, that 75 shares in the Paw Paw Company were not represented at the stockholders' meeting which authorized the sale. The recitals of the deed and mortgage showed that more than two thirds of the stockholders of the vendor company were present and assenting. This, with the provision of the law that such majority could confer the requisite authority for the sale, was all that the trustees and holders of the bonds were required to notice. Nor was there anything in the recital to show who the holder of said 75 shares was, or that he was, or would be, an objector to the sale.

By the law of Michigan, shares of stock in incorporated companies are personal property. Young, so far as it appears, had never notified the Paw Paw Company, or the stockholders and directors thereof, that he had the original Longwell certificate No. 114, for 75 shares, nor had he demanded any registration of the transfer thereof to himself on the books of the company, although the certificate, upon its face, recited that the stock was "transferable only on the books of said company, by the holders thereof, in person or by attorney, on sur-

render of this certificate." While the transfer on the back of the certificate invested him with the equitable ownership of the 75 shares, and entitled him to demand the registration thereof, his title as between himself and the corporation, remained inchoate until such demand was made, or until the transfer was recorded upon the corporate books. It is not alleged in Young's intervening answer, nor is it shown, that the meeting of the Paw Paw stockholders on September 9, 1886, at which the sale was authorized, was not regularly called, by giving proper notice to the shareholders of record, but only that he did not have notice of the meeting, and that he was not present, and had never assented to the action then taken. Not being a stockholder of record, and it not appearing that the corporation or its officers had any knowledge of his being the holder of the original Longwell certificate of 75 shares, he was not in a position to claim notice of said meeting, nor can he properly complain of the failure to receive the same. It is questionable whether, as a holder of the shares by mere transfer indorsed on the original certificate, which was in the nature of a nonnegotiable chose in action, (Dewing v. Perdicaries, 96 U. S. 196,) he would have been entitled to a vote, or could have voted, at said meeting, (1 Beach, Priv. Corp. § 66c, and cases cited in note 3; also 2 Beach, Priv. Corp. § 634c, and notes thereto.)

But Young's absence from the stockholders' meeting places him in no better or more favorable position than if he had been present, and voted against the resolution to sell; for his minority objection could not have obstructed or defeated the right of the other stockholders, owning two thirds and over of the capital stock, from giving a lawful assent to the sale, which, when executed in pursuance thereof, operated to transfer the property and franchises of the vendor company to the purchasing company as fully and as completely as if Young had himself expressly consented thereto. The sale, being sanctioned by the requisite majority of stockholders, and made by the corporation, as provided and authorized by the general law of the state under which the company was organized, invested the purchasing company with as perfect a title to the property and franchises as was vested in or held by the vendor corporation, and operated to make the purchasing corporation the legal successor of the vendor corporation. It would be paradoxical to hold that such a sale was valid as to the corporation, and invalid as to one of its stockholders who objected thereto, and whose assent was not necessary to give validity ·to the transaction. It would be equally inconsistent to hold that such a sale, made under and in pursuance of statutory authority in force at the organization of the corporation and at the date of the transaction, should be treated as only binding upon the corporation and the stockholders assenting thereto, and invalid as to a dissenting shareholder whose consent was not a prerequisite to its validity. Counsel for the appellee Young have treated this case as if the question before the court was whether said appellee could be made to accept stock in the purchasing company for his shares in the Paw Paw Company, or be required to surrender his stock in the latter until he was paid for the same. That is not the question involved in this suit, nor was it the

question involved in the state suit.    The Toledo & South Haven Railroad Company, having acquired a valid title to the property and franchises of the Paw Paw Railroad Company for a valuable consideration paid therefor, was under no legal duty or obligation to pay said Young the value of his stock in the latter company; and if it had not, in its answer in the state suit, submitted, or offered to do so, upon no principle of law, known to us, could Young have obtained a decree of that court against such purchasers.    If, notwithstanding that decree, he is still to be treated as a holder of said 75 shares, either in his own right or as security for the payment of the $3,500 which the Toledo & South Haven Railroad Company was adjudged to pay him therefor, upon what principle can he be given a priority of satisfaction out of the property which the Toledo & South Haven Railroad Company has lawfully acquired from the Paw Paw Railroad Company, and mortgaged to secure bonds duly issued, which have passed into the hands of bona fide holders without notice of his rights?    The question involved in this suit is whether his equity, regarding him either as a judgment creditor of the Toledo & South Haven Railroad Company, or as a stockholder of the Paw Paw Railroad Company, is superior to the rights of the appellant, and the holders of bonds whom it represents, under the mortgage of the Toledo & South Haven Railroad Company, made and executed after it had lawfully acquired the title to the Paw Paw Company's property and franchises covered by said mortgage.    The mortgagee holds the same valid title which the Toledo & South Haven Railroad Company acquired by its purchase.    Young's rights as a subsequent judgment creditor of the mortgagor are clearly subordinate to that mortgage, and the lien of the bondholders thereunder.    As a stockholder in the Paw Paw Company, or in the corporation which legally succeeded to the former's franchises and property, Young cannot either disturb the sale, or follow the property, and assert rights therein superior to those of the mortgagee.

We are not called upon, in this case, to determine whether Young, if not bound to accept his proportion of the consideration received by the Paw Paw Company for the transfer of its property and franchises, could have proceeded against said corporation and his associate shareholders to recover the value of his stock.    Without deciding the point, we are inclined to the opinion that a minority stockholder in cases like the present, where the corporate sale is valid and honest, must look to his own company and coshareholders for such relief as he may be entitled to.

We do not mean to question the proposition that a court of equity will, at the suit of a minority, restrain the majority from appropriating to themselves the assets of the corporation, or from obtaining advantages not shared in by the minority.    Mason v. Mining Co., 133 U. S. 50, 10 Sup. Ct. Rep. 224, furnishes an illustration of this principle.    There the majority of stockholders, upon the dissolution of the corporation, or the expiration of its charter, attempted to appropriate its property and assets at a greatly inadequate valuation.    The minority successfully resisted such attempt.    The principle of that decision is not involved in the present case, where the interests and

rights of each and every stockholder in the transaction were placed upon the same footing, and where the question to be determined is whether, after a valid sale of corporate property, a dissenting stockholder can either attack the sale, or follow the property in the hands of the lawful vendee corporation, and assert rights therein superior to the mortgage creditors of the latter.

There is nothing in the point urged by counsel for appellee Young, that parties taking the bonds of the Toledo & South Haven Railroad Company, secured by the mortgage of October 27, 1886, after the commencement of his suit in the state court, and after an injunction restraining the mortgagor from negotiating said bonds, cannot be considered as bona fide holders thereof. These bonds were negotiated in the state of New York, and were taken by parties who had neither actual nor constructive notice of Young's suit. Aside from this, it is settled that a bona fide holder of negotiable corporate bonds is not subject to the general doctrine of lis pendens. This exception holds even though the paper was purchased during the pendency of a suit in which its issue was finally declared invalid, the purchaser not being affected with notice thereof. Lexington v. Butler, 14 Wall. 283; Warren Co. v. Marcy, 97 U. S. 96; Douglass v. Pike Co., 101 U. S. 687; 2 Beach, Priv. Corp. § 666c.

On the second question presented by the appeal, it appears from the record that Frederick F. Woodward, of New York, is the bona fide holder and owner of six of said series of bonds, numbered from 1 to 6, inclusive, which were duly negotiated and sold before maturity, for value received, by or for the mortgagor railroad company. The remaining 210 bonds of said issue were originally, in 1887, pledged by the said Toledo & South Haven Railroad Company to the First National Bank of New York city as collateral security for a large loan made by said bank to the railroad company at the date of the hypothecation. By the terms of the pledge the bank was authorized to sell said collateral, without notice, at public or private sale, in case of nonpayment of the loan at maturity; and it was furthermore "understood and agreed [between the parties] that, upon any sale of any or all of the within collateral, the First National Bank of New York may become the purchaser thereof, and hold the same thereafter in its own right, absolutely, free from any claim of ours." This was one of the terms of the note and pledge executed by the Toledo & South Haven Railroad Company. Said railroad company made default in paying the loan after the same had been increased and renewed, and, being for a long while thereafter in default, the bank, under date of June 24, 1889, gave the company due and formal written notice that unless its note evidencing the loan and its indebtedness was paid on or before December 30, 1889, it would sell said 210 first mortgage bonds held as collateral at public auction on January 3, 1890, at 12 o'clock noon at a designated place in the city of New York, as authorized by the terms of the railroad company's note and pledge, and apply the proceeds towards the payment of said company's indebtedness.

The railroad company failed to make such payment, and on the day designated, and at the place and time indicated, in said notice,

said bonds were sold at public auction, the sale having been also advertised in one or more of the daily newspapers of New York city, and were purchased by said bank at and for the sum of $20,000, which amount it credited on the railroad company's note.   This sale of said bonds, and the purchase thereof by the bank, has not been called in question by the Toledo & South Haven Railroad Company, nor does said railroad company, in the present proceeding, in any way controvert or dispute the bank's title to and ownership of said bonds. The intervening defendant, Young, who is neither a stockholder in, nor has any direct connection with, the Toledo & South Haven Railroad Company, claimed in the court below, and has urged here, that under the provisions of section 3352, How. St. Mich., and the resolution of the stockholders authorizing the issuance of said bonds, there could be no lawful pledge of the same, but only a direct sale thereof by the officers of the company.   Section 3352 of the Michigan Statutes, (1 How. St.,) so far as relates to the question, provides that "all companies organized under this act shall have power, from time to time, to borrow such sums of money as may be necessary for completing, finishing, equipping, or operating their road, or any part thereof, or for paying any indebtedness necessarily incurred for completing, finishing, or operating their road, or any part thereof, and to issue and dispose of their bonds or obligations for any amount necessarily borrowed for such purpose, and for such sums and for such rate of interest, not exceeding 10 per cent., as they may deem advisable, and to mortgage their corporate property and franchises, and income thereof, or any part thereof, to secure the payment of any debt, contracted;   *   *   *   and said company may sell their bonds or obligation either within or without the state, and at such place and prices as they may deem proper."   The stockholders' resolution authorizing the issuance of bonds in this case directs the managing body of the company "to borrow such sums of money as they may think necessary for completing, equipping, and operating its road, *   *   *   and to issue and dispose of the bonds of the company for any amount borrowed for such purpose, for such sums and for such rates of interest, not exceeding 7 per cent., as they may deem advisable, and to mortgage the corporate property and franchises, and the income thereof, to secure the same, and to sell such bonds on the best terms they may be able to obtain for the same."   It admits of little or no question that under said section 3352, and said resolution, there was ample authority to pledge the bonds as collateral for the money borrowed of the First National Bank of New York. Under the New York statute, from which section 3352 of the Michigan law is evidently taken, it is settled that under authority to borrow money, and "to issue and dispose" of bonds in connection therewith, there is the right to pledge such securities as collateral for the sums borrowed.   Duncomb v. Railroad Co., 84 N. Y. 190.   So in Beecher v. Mill Co., 45 Mich. 103, 7 N. W. Rep. 695, where bonds of a corporation were issued on the understanding that they were to be sold for cash, but were in fact pledged to a creditor as collateral to corporate notes held by him, it seems to have been held by the court that the objection that such disposition of the bonds was

unlawful could only be taken by the corporation or its stockholders; that it was not open to strangers, or even to a purchaser of the equity of redemption at execution. Without going into a review of the decisions, we are of the opinion that the weight of modern authority, as well as sound principle, establishes the general rule that, in respect to negotiable securities, authority to sell carries with it authority to pledge. Platt v. Railroad Co., 99 U. S. 48, and Leo v. Railway Co., 17 Fed. Rep. 275. While the court below did not entertain this objection on the part of the intervener, Young, it nevertheless held the position of the First National Bank of New York was not substantially changed with reference to the 210 bonds by selling them under the pledge, and buying them in, and that the amount for which the complainant was entitled to have a decree of foreclosure, as against the railroad company, was the actual amount of the bank's loan remaining unpaid, with interest, which was ascertained and fixed at $211,124.69, with interest at 6 per cent. from January 22, 1892. The face of the 210 bonds, with the unpaid coupons thereto attached, is largely in excess of the amount allowed in favor of the said bank. The sale and purchase of these bonds by the bank under and within the terms of the railroad company's note and pledge of the collateral was not per se void. It was at most only voidable, at the instance, and upon reasonable objection, on the part of the corporation or its stockholders. Third parties or strangers have no right to question or challenge the bank's title to the bonds on the ground either of inadequacy of the price paid for the same, or for the reason that it occupied such a quasi trust relation to the pledgor as to disqualify it from purchasing at a sale made for its own benefit. The securities having been regularly issued and hypothecated as collateral for a debt the company was authorized to contract, and thereafter lawfully sold under the terms of the pledge, upon proper notice, even the maker of the paper could not impeach the purchaser's title thereto, and the right to recover the amount thereof, without setting up and establishing fraud or breach of trust causing injury. Such an objection, by way of impeachment of the purchaser's title to the pledged security, is manifestly personal, or, in cases like the present, is confined to the corporation or its stockholders. Young's relation to the railroad company was not such as entitled him to question the bank's title to the bonds, or complainant's right, as the legal representative of the bondholders, to foreclose for the full amount thereof. We think the court below was in error in not allowing the decree of foreclosure to go for the full amount of 210 bonds and unpaid coupons thereto attached. Our conclusion upon the whole is that the decree of the lower court is erroneous in the two particulars above referred to, and assigned as error by the appellant; and said decree is in said two respects reversed, and the cause is remanded to the circuit court, from whence it came to this court, with directions to enter a new decree in conformity with this opinion. The costs of the appeal will be taxed against the appellee, Charles F. Young.

TAFT, Circuit Judge, (concurring.)   I concur in the result reached in the foregoing opinion, but I cannot concur in the grounds stated therefor.   In the court below, Young, as an intervener, sought to have declared in his favor a lien in the nature of a vendor's lien on the property of the Paw Paw Railroad Company, which had passed by sale to the Toledo & South Haven Railroad Company, and a consequent priority in the distribution of the funds arising from the foreclosure sale in this case.   In the supreme court of Michigan, Young had prayed the same relief against the same companies that are parties to this record on the same grounds; and the supreme court denied his prayer, and gave him only a judgment and execution against the Toledo & South Haven Railroad Company for the value of his stock, without any lien.   The decree and judgment of the Michigan supreme court are res adjudicata, therefore, between Young and the railroad company, on the question of his right to a lien on its property.   The complainant below, the Farmers' Loan & Trust Company, is privy in right to the railroad company in respect of the property on which it holds the mortgage; so that, whether it was really a party to the proceeding in the state court or not, it may avail itself of the adjudication as an estoppel against Young.   If Young was not entitled to a lien in the state court, he is clearly not entitled to priority in distribution in the case at bar.   This, it seems to me, satisfactorily disposes of Young's contention at the bar, and requires us to reverse the decree of the court, in so far as it orders the payment of Young's judgment before that of the mortgage bonds.

It would seem, also, that Young had no right to intervene in this foreclosure proceeding against the objection of the complainant, because his claim grew out of a transaction which was anterior to the passing of the title to the defendant company being foreclosed, and which was claimed to give him a lien superior to that title.

The opinion of the senior circuit judge, however, denies Young's right on grounds wholly independent of former adjudication, and on propositions of general equity jurisprudence in which I find myself unable to concur.

Under the statute of Michigan permitting the sale of an uncompleted railroad by its stockholders to another road, the words of which are quoted in the foregoing opinion, there is no power in two thirds in interest of the stockholders to bind one third to a sale for any consideration but money or money credit.   We have already held in this court, in the case of Perin v. Megibben, 53 Fed. Rep. 86, that a statutory power to sell does not include a power to exchange for shares of stock in a corporation.   Nor do I understand the supreme court of Michigan to hold, in the case of Young v. Railroad Co., 76 Mich. 485, 43 N. W. Rep. 632, that it is within the power of two thirds of the stockholders, under this statute, to bind a minority to a sale for anything but money, for Chief Justice Sherwood says in the opinion, (page 497, 76 Mich., and page 636, 43 N. W. Rep.:)

"The plaintiff appears in a court of equity to seek and enforce what he conceives to be his equitable rights, and in so doing he must submit to what is right and just; and, in my judgment, his counsel at the circuit, in submitting the case to the learned circuit judge, was not far out of the way when he

stated to the court the claim of his client should be satisfied with the payment of such amount as the stock he held was worth; and while he cannot be held to the mode of payment provided by the terms of purchase by the Toledo & South Haven Railroad Company, because of his consent never having been obtained thereto in any legal way, equity and justice required that he should transfer to said company his seventy-five shares of stock upon receiving or being tendered the value of the same, at the time the company made its purchase, in money."

This holding of the court was obviously based on the fact that Young was equitably bound, by the contract of his vendors, known to him when he bought, to transfer the stock to the Toledo & South Haven Railroad Company, and was therefore deprived of the right which he otherwise would have had, as a minority stockholder, to prevent the consummation of a sale which did not contemplate money, or a money credit, as its consideration. There is no doubt whatever of the proposition argued in the foregoing opinion,—that a minority stockholder is bound by the acts of the majority so long as that majority acts within its charter powers,—nor is there any doubt that neither the majority nor the entire body of stockholders of the corporation can do a corporate act which its charter forbids; but there are corporate acts which are not within the charter power of the majority of the stockholders, and yet which are not beyond the power of the corporation. They are acts of the corporation, which the state, as the grantor of the corporate franchise, has no interest to invalidate, provided all the stockholders consent thereto. They are acts which, if done by a majority only, infringe upon the charter rights of the minority. In this case the power to sell for money was conferred by statute upon two thirds of the stockholders of the uncompleted road. The sale could not be for stock in another company, against the objection of the minority stockholders. No such power was vested by the statute in the two-thirds majority. If, however, the minority consented, the state, the grantor of the corporate franchise, had no interest in objecting to the transaction as beyond the corporate power of the company. Every Paw Paw stockholder consented to the sale for stock in the Toledo & South Haven Railroad Company except Young, who owned 75 shares. He or his vendors had agreed to sell his stock to the purchasing company for money, in order that the sale of the Paw Paw Company might go through. In equity, therefore, he could not object to the sale, provided that he was paid the money value of his stock. It would seem reasonable, and in accord with equitable principles, that the validity of the sale of the Paw Paw road should be conditioned on Young's receiving the money value for his stock, and that, on failure of the Toledo & South Haven Railroad Company to pay the purchasing price, he should have a lien on the property conveyed, in which his stock represented an interest. The supreme court of Michigan, however, was of the opinion that equity did not require that a lien should be reserved to pay the purchase price. As res adjudicata, and perhaps as a decision of a state supreme court upon a question of state law, we are obliged to follow the decision of that court in the case at bar. But as a question of general equity jurisprudence, which is the aspect in which the questions are discussed in the opinion of the

senior circuit judge, I am unable to concur in the propositions there laid down.

I see no objection to reserving a lien on the corporate property for the purchase price of shares of stock, where those shares represent a right to object to the sale of the property for anything but money. It is quite true that the shares do not generally represent a tenancy in common in the property itself, but only a voice in the control of the property, a share in the profits to be derived from the use of the property, and a share in the assets of the company on dissolution, after the payment of debts. But the sale here was of the property of the Paw Paw Corporation, the consideration to be divided among the stockholders on the very theory that a share of stock represented an aliquot interest in the property sold. The circumstances seem to me to clearly justify a court of equity in reserving something akin to a vendor's lien in the property sold, to secure the right of a dissenting stockholder to get his part of the consideration in money.

The mortgagee had full and actual notice, from the recitals in the title deeds of its mortgagor, that the consideration for the sale of the Paw Paw road was not money, but stock, and that the owner of the 75 shares of the Paw Paw Company had not consented to the sale. If the construction given above of the Michigan statute is correct, then the mortgagee was charged with notice that the sale was illegal, against the owner of the 75 shares, and was therefore put on inquiry and notice as to his right to a lien for the value of his stock.

Nor do I concur in the reasoning of the court, that the issuing of an execution upon a judgment for the money value of the thing sold is a waiver of the vendor's lien in the thing sold. There is nothing inconsistent, under such circumstances, in an execution and the enforcement of a lien. The cases cited in the majority opinion have, it seems to me, but little application. They are cases where a man is compelled to elect whether he will sue for the price of an article sold, or set aside the sale as fraudulent, and recover the thing in specie. They none of them present a case in equity where the circumstances give to the vendors the right to recover the price of the thing sold, with a lien for that price on the thing sold. In such a case the recovery of the money, and the enforcement of the lien, are not inconsistent remedies, and the pursuit of the one is no waiver of the other.

I concur in both the reasoning and conclusions of the court with respect to the rights of the First National Bank of New York city in the bonds held by it, and have nothing to add thereto.

HAMMOND, J. I concur in the result reached by the other judges of the court, but not altogether in the reasoning of either of the opinions which they have given. Apart from the statute of Michigan authorizing railroad companies, under certain conditions, to do that which was done in this case, and apart from the effect of the adjudications of the state courts of Michigan upon the rights of the parties to this controversy, I should have no doubt of Young's right to

a decree,—not, indeed, to enforce any lien of the judgment he has obtained, either perforce of the judgment itself, or of any lien akin to the vendor's lien, nor yet to recover the money value of his shares of stock,—but a decree to charge the plaintiff here, who can, in my opinion, not at all occupy the attitude of an innocent purchaser for value, without notice, as a trustee of his corporate property, and responsible to account, as such, either for its value, or upon a sale for distribution among the corporate owners,—the one or the other, according to circumstances. The Toledo & South Haven Railroad Company could claim to discharge itself from this obligation of accounting only by the performance of its undertaking to pay the $3,500, however, on the facts of this case, that undertaking may have arisen. Not having performed it, there could be no holding of Young to it, and shunting him off to the position of a simple contract creditor; but on such failure he would be remitted to his right of an accounting for his share of the corporate property, into whosesoever hands it may have come, and a sale for its distribution, or else the payment of its value, otherwise ascertained, in legal-tender money, and in nothing else, if he insisted on his right to money.

I do not think that any corporation can go out of business, and sell its properties and franchises in entirety, (outside of sales made in the ordinary course of business,) and bind a minority of the stockholders, by the will of the majority, to such a sale, upon any principle of the public welfare or like consideration; certainly, not to compel the minority, on such a sale, to take chips and whetstones for their shares of stock,—that is to say, anything else than money. Moreover, I doubt seriously the power of the state, by legislation, to compel the minority to so surrender their property. I do not deny that the majority of the stockholders, in order to preserve for themselves and the minority the advantage of a sale en bloc, rather than a resort to a winding up and accounting among each other for their respective shares of the corporate property, and to prevent the destruction of the corporate franchises by a winding-up, might, under some conditions have, in a court of equity, the right to compel the dissentients to an ascertainment of the value of their shares in some other way than by a sale for distribution, and that ordinarily the market value of the shares might be resorted to as a measure of that value, and that upon such ascertainment the court might compel the dissentients to surrender their shares upon the payment, in legal-tender money, of this value; and, what the court could compel, the stockholders, without compulsion, could do by agreement inter sese. But this power could not be enlarged into any compulsion of assent to a scheme of alienation of the corporate property which left the minority nothing but stocks in new enterprises, or other modes of compensation, for their shares in the corporate property. Ordinarily, in the absence of special powers conferred in the charter or otherwise, by law, the stockholders have, not as tenants in common or joint tenants, perhaps, but as corporate owners or as corporate tenants, if you please, the right to a distribution of the corporate property whenever the company ceases to operate its franchises, and goes out of business, for any cause, whether that of a sale to others,

or for some other reason; and those who wish to acquire the property without a necessity for this distribution have a ready method of acquiring all the stock itself, and this seems, rightly and justly, the only method; and it cannot be that the majority can substitute other property for that of the corporation, such as stock in another corporation, or the like, and force the minority to accept this substitute as a fund for distribution, rather than to claim their interest in the corporate property, or the money fund it would bring at a sale for distribution.    This view brings the result already suggested, that Young would have had the right to a sale of the Paw Paw property —not the consolidated property of the Toledo & South Haven Company—for distribution, and he and the Toledo & South Haven Company, either as direct holders of the shares of the majority stockholders, or as holders of those shares substituted in equity to the rights of their vendors, and not at all as purchasers of the property, be it remembered, would have divided the proceeds of this sale according to the respective shares of each, as represented by their holdings of the stock; Young taking his share, be it more or less than the $3,500 which was promised, but never paid, as a consideration for the transfer of his stock, but which, not having been paid, he could not have been compelled to transfer, and, being still the holder, he would, at the distribution, take his share as stockholder, just as they would, and there would be no question of vendor and purchaser.    The plaintiff could have occupied no better attitude than the Toledo & South Haven Company; for in this view it would have been impossible to hold the position of innocent purchaser for value, without notice, since Young's right of distribution inhered in the very nature of the property itself, to say nothing of other facts to put the plaintiff on notice of Young's rights, as shown by this record.    Indeed, this view brings out the equities of the parties quite disembarrassed from the sale of the property to the Toledo & South Haven Company, which sale, while it may not have been void in toto, either as to Young or any one else, could have operated only subject to his equity of distribution; the plaintiff becoming, in the end, a trustee for him, and chargeable as such, and not otherwise.

But, unfortunately for Young, he did not, and cannot, occupy this favorable attitude as to his stock.    I agree with Mr. Circuit Judge JACKSON, that the statute of Michigan in force at the time Young or his vendor subscribed for the stock became as much a part of the charter of his company as if that statute had been written in it, and by that statute the company was authorized to do that which it did in effecting a sale of the property. He held his stock subject to this statutory power of the stockholders to dispose of the property in the way they attempted to do; and whatever disadvantage there may have been, or injustice, to the minority dissentient, arises out of the statute, and is an infirmity inhering in such property, to which shareholders must submit.    It is the kind of company he joined by his subscription. It is not necessary to examine closely the questions made as to the alleged irregularities in this sale.    My brother judges agree, for reasons they give, that Young's intervening petition cannot

be granted; and whatever I might think of these irregularities would be, under the circumstances, quite unimportant. But it is proper to remark that these irregularities are not such as to avoid the sale, either wholly or in part, as to Young, so as to let in what I shall call his "equity of distribution," already commented on by me. The sale was accomplished under a statutory power, and the title transferred. Out of these irregularities there could grow or be created no lien of any kind upon the property, either as a whole, or as to Young's share, akin to the vendor's lien, or of any other nature known to the law; for the law of corporations contains no principle of a lien upon the property of the corporation sold under a statutory power, the statute not providing for the lien. If the stock was sold, that was personal property. If the franchises were sold, that was personal property. If the road, structures, and equipments were sold, that might be real estate. But the technical equitable vendor's lien could hardly apply, as to that, on such a sale. But, if it did, then it would only secure the purchase money, and not the distributive share of a dissentient stockholder, arising out of what I have called the "equity of distribution." If it be conceded that under the Michigan statute the dissentient stockholder is still entitled to the money value of his shares, yet the statute provides no lien for that value, the contract of sale by the trustees provides none, and it does not follow that the sale is void for want of such provisions, nor that any lien arises, ipso facto, out of the sale. It is the ordinary case of one selling his land or other property without the precaution of reserving a lien or taking a mortgage to secure the price. Perhaps a timely application to a court of equity by Young would have controlled the majority of the stockholders in the exercise of their statutory power, so as to compel them to exercise that power reasonably, and not to part with the property, or the title to it, until, by the terms of the sale, some reasonable security had been provided for the minority stockholders, as to the payment for their shares; but none such was made, or, if any of his attempts to protect himself could be taken as such, they were not effectual, and the title, having passed, has come into the hands of the plaintiffs, under circumstances which make their position as holders of the legal title such that they stand on an equality with Young in a court of equity. Their equities would be equal to his, and, having the legal title, they would not be compelled to part with it, unless, at least, he should first offer to make them whole by returning the consideration they paid for the property. He let the title to his property pass into the hands of the Toledo & South Haven Railroad Company, irregularly, it may be; but none the less it did pass, and the possession along with it. Now, whatever notice they had, or might have had by inquiry, of the irregularities, these not being such as to make the sale void, Young could not avoid it, as against the plaintiff, paying a fair consideration for it, except upon some superior equity to theirs, and in such a case the legal title turns the scale in plaintiff's favor. Moreover, Young affirmed the sale by taking his judgment against the Toledo

& South Haven Railroad Company for his share of the price, instead of proceeding to compel the stockholders to put into the terms of sale some security for his share. I say, again, he is in the position of one improvidently selling his property without providing a security for the price, and it is too late for us to provide one for him. His trustees of the statutory power have, in spite of his struggles, injuriously managed the sale, and the responsibility is theirs, perhaps. Nevertheless, he is bound by their act in the premises, and we can give him no relief.

The state courts of Michigan reached substantially and practically the same result, by denying to him any lien, and confining him to a personal judgment against the Toledo & South Haven Railroad Company, either upon the theory of an undertaking by that company in the original purchase to pay him the money value of his stock, or upon their offer in their answer to do that thing, as Mr. Circuit Judge JACKSON thinks. Perhaps, the supreme court of Michigan did not intend to establish that the statutory power of the majority stockholders might be exercised so as to compel the dissentients to share in whatever other fund than money was the price of the property, and were of the opinion that even under the statute a dissentient could claim a money value for his share, as Mr. Circuit Judge TAFT thinks; but, after all, it comes to this: a money value was provided for Young, and he has a judgment for it. But the trouble is that neither in the negotiations for the sale, nor in the contract of sale, was any security provided by the trustees of the power of sale for that money value; and, without such provision by them, he can acquire none, upon any principle or theory that occurs to me, or has been suggested by any one. Outside the statutory power, none would exist, in my opinion, to thus cut him out of his equity of distribution. Inside the statute, he has been lost, as many another has been lost, by the desertion of the trustees of the power of sale from their trust in its relation to a dissentient stockholder, and, if he has any remedy, it is against them, personally, for their mismanagement of the trust, and not against the holder of the legal title for a valuable consideration, paid or agreed to be paid, to the trustees upon an effectual, though it may be irregular, exercise of their power.