McDOUGALL v. HAZELTON TRIPOD-BOILER CO. et al.

HAZELTON TRIPOD-BOILER CO. et al. v. McDOUGALL.

(Circuit Court of Appeals, Sixth Circuit. July 5, 1898.)

Nos. 537, 538.

1. CORPORATIONS—AUTHORITY OF PRESIDENT—ESTOPPEL.
   A corporation, which by resolution has empowered its president to pledge a contract, under which money is due it, as collateral security for money borrowed, cannot claim that the terms of the pledge made by the president are in excess of the authority conferred on him, when at the time of the pledge it was cognizant of all the particulars thereof, and received the money borrowed, and gave no sign of repudiating the transaction.

2. SAME.
   A pledgor cannot object that a sale of the thing pledged by one acting as agent of the pledgee was unauthorized by the latter, when it appears that such agent acted upon an assumption of authority, and that the pledgee was aware of the sale, and never made any objection to it.

3. PLEDGE—SALE BY PLEDGEE—NOTICE.
   A pledgee, authorized by the terms of the pledge to sell the securities without notice to the pledgor, is not bound to notify the pledgor of the grounds on which he exercises the power of sale.

**4. BILLS AND NOTES—MATURITY—DEMAND.**

When a note is made payable five days after demand, an express demand in explicit terms is not in all cases and for all purposes necessary. If the payee signifies to the maker his desire for payment in such manner as to be the equivalent of a request, this is sufficient.

**5. SAME—EFFECT OF SALE.**

A sale of collateral by the pledgee pursuant to the terms of the pledge conveys the entire interest, so that the pledgor is not entitled, as against the purchaser, to a surplus realized by him beyond the amount for which the pledge was made.

**6. SAME—EXPENSES OF REALIZING ON PLEDGED SECURITY.**

A corporation, claiming money under a contract, after instituting suit thereon, pledged the contract with a third person as collateral, but continued to prosecute the suit in its own name, with a view of realizing for itself a surplus above the amount of the debt secured by the pledge. After it obtained decree, one who had purchased the contract from the pledgee under his power of sale intervened, and claimed the proceeds of the decree. *Held,* that the pledgor was not entitled to be repaid out of the fund the expenses incurred in prosecuting the suit.

**7. ATTORNEY AND CLIENT—LIEN FOR SERVICES.**

The rule giving attorneys and solicitors a lien upon the recovery for compensation for their services extends also to expenses incurred in rendering the services.

Appeals from the Circuit Court of the United States for the Northern Division of the Western District of Tennessee.

The original bill in this cause was filed on January 21, 1892, by the Hazelton Tripod-Boiler Company against the Citizens' Street-Railroad Company for the purpose of obtaining a decree, and enforcing a mechanic's lien upon a lot in Memphis on which were the steam power and machinery by which the railroad company operated its railway system. The amount for which a decree and the enforcement of the lien were prayed was the sum of $17,000, and some interest; the principal sum being the purchase price for three steam boilers furnished by the boiler company, a corporation located at Chicago, to the railroad company, a corporation doing business at Memphis, for the purpose of supplying the latter with power. The contract between the companies, under which the boilers were supplied, had been made in April, 1891, and the boilers were set up during that year; but the purchase price, though in terms due some time previous to the filing of the bill, had not been paid,—the railroad company having refused payment upon the ground that the boilers were defective, and not in conformity with the contract. Upon the filing of the bill the railroad company appeared and answered; setting up the faulty execution of the contract on the part of the boiler company in defense, and further alleging that the contract itself, in respect to the purchase, was modified by a further stipulation that it should not exceed the cost of construction. On June 6, 1892,—a few months after filing the bill,—the boiler company, being in need of funds, borrowed $10,000 from George Linyard, of New York, and gave him its promissory note therefor, with interest; therein also pledging the boiler company's interest in the contract with the railroad company above set forth. This instrument was in the language following:

"$10,000.                              Chicago, Illinois, June 6th, 1892.

"Five days after demand, for value received, we promise to pay to the order of ourselves the sum of ten thousand dollars, at our office, 1410 Manhattan Building, with interest at the rate of six per cent. per annum after date; having deposited with said legal holder of same, as collateral security, our contract with Citizens' Street-Railroad Company of Shelby County, Tennessee, Memphis, Tennessee, dated April 15, 1891, and accepted May 2, 1891, which we hereby give the said legal holder of said note, his agent or assignee, authority to sell, or any part thereof, on the maturity of this note, or at any time thereafter, or before, in the event of said securities depreciating in value in the opinion of said legal holder of said note, at public or private sale, at the

discretion of said legal holder of said note, his assignee, without advertising the same or demanding payment, or giving us any notice, and to apply so much of the proceeds thereof to the payment of this note as may be necessary to the same, with all interest due thereon, and also to the payment of all expenses attending the sale of the said collateral, including attorney's fees; and in case the proceeds of the sale of the said collateral shall not cover the principal, interest, and expenses, we promise to pay the deficiency forthwith, after such sale.                              Hazelton Tripod-Boiler Co.,
                                          "By C. B. Holmes, President."

In October, 1892, as Linyard alleges, he sent this instrument to L. H. Bisbee, one of the solicitors for the boiler company in the then pending suit, with instructions to collect it, and, after paying Linyard what was due him, to pay the balance to the boiler company. In December following, the boiler company, having become insolvent, made an assignment for the benefit of its creditors to G. W. Griffin, as trustee; and he subsequently became a party to the suit, as co-complainant. The taking of proof, and other preliminary matters, prolonged the suit for several years. In November, 1894, Linyard tendered, and by leave of the court filed, a supplemental bill, so called, alleging his acquisition of the note and pledge above mentioned, that he had sent the instrument to Bisbee, as above stated; that Bisbee had not collected the note, and had refused to return it to Linyard on the latter's request; that he had therefore revoked Bisbee's authority; and he prayed that the proceeds of the suit should first be applied in satisfaction of the note. To this bill the boiler company and Griffin, assignee, were made defendants, and they answered, admitting the substantial allegations of the bill. During the progress of the suit, and after considerable proof had been taken, the case was brought on for hearing; and the court, apparently being in doubt whether the contract for the boilers was modified to the extent that the price should not exceed their actual cost, ordered a reference to the master to ascertain and report what that cost was. This duty was performed by the master, but, as it was finally held by the court that the decree should be for the contract price, further reference to that report is unnecessary.

On January 6, 1896, Linyard, after having made, as he claims, repeated but ineffectual efforts to realize his debt by demand upon the assignee, and endeavor to sell his collateral, finally sold the contract to William McDougall for the sum of $11,000. On the 17th of the same month, Judge Hammond, who had heard the case, filed an opinion ordering a decree in favor of the boiler company for the amount specified by the contract, with interest. 72 Fed. 317. A few days thereafter, McDougall made application to the court for leave to file a supplemental bill setting up the transfer to him of the subject-matter of the suit, and praying that the decree might be entered in his favor. Leave to file this bill was postponed until after the decree should be entered. On January 31st the final decree in the primary controversy for $18,473.37 was entered in favor of the boiler company against the railroad company, and, this being done, McDougall's bill was permitted to be filed. Id. 325. The railroad company paid the amount decreed against it into court, and this was turned into the registry to await the determination of the claims upon it set up by various parties. The boiler company, upon grounds stated in the opinion, claimed that the pledge of the collateral in the note was unauthorized, and, further, that the sale by Linyard to McDougall was inoperative to convey more than so much of the interest in the contract as would suffice to pay the $10,000 borrowed from Linyard, with interest, and therefore it was entitled to the whole of the decree, or at all events to the surplus of the decree after that debt was satisfied. Bisbee and Metcalf & Walker, the counsel who had conducted the suit for the complainant, asserted a lien upon the fund for their services, the value of which, upon reference, was fixed at $3,000; and $131.70 were allowed them for personal expenses which they also claimed. Griffin made claim for his personal expenses incurred in the progress of the litigation, which by like reference were found to amount to $548.62. All these claims were denied by McDougall, who insisted that the whole amount of the decree should be paid to him. Upon final hearing, Judge Clark, who heard the case upon these controversies, held that the claim

of the boiler company to the whole decree or to the surplus was not maintainable; that Bisbee and Metcalf & Walker were entitled to the lien claimed by them for counsel fees and expenses, in the amounts above stated; and that Griffin was not entitled to be reimbursed for his personal expenses incurred in the suit. A decree for distribution of the fund was entered accordingly. Some minor details of fact are noted in the opinion following. The boiler company and Griffin appeal from so much of the decree as denies their respective claims, and McDougall appeals from the allowance of the claims of Bisbee and Metcalf & Walker for counsel fees and expenses.

J. H. Watkins, for McDougall.

S. P. Walker, for Hazelton Tripod-Boiler Co.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

SEVERENS, District Judge, having stated the case as above, delivered the opinion of the court.

The boiler company, upon its appeal, contests the right of McDougall to take the whole of the decree against the railroad company, subject to the lien of counsel, on various grounds:

1. It is urged that the pledge of the collateral to the note was void because in excess of the authority conferred upon Holmes, the president of the company, who transacted the business, by the board of directors. The resolution authorizing him in terms empowered him to assign the contract to the holder of the note, as security therefor, and to authorize such holder to collect the amount due on the contract, to satisfy himself for the sum due on the note, with interest, together with all expenses of collection, and thereupon to require him to account to the boiler company for the surplus. The note was negotiable, and it is manifest that it was anticipated that the note, with the collateral, might pass into other hands by transfer from the original holder. The collateral was an incident, and would pass by the transfer of the debt to the new holder, and he would be authorized to take all appropriate measures for the collection of the money due on the contract pledged. Construing the resolution of the board strictly, it might be doubted whether, if Linyard had known its terms, he could have enforced the payment of the note by a sale of the contract pledged. Possibly it might still have been competent for him to have urged that under the resolution itself he was entitled to the ordinary rights of a pledgee, which would have included the power of sale, as well as the right to enforce collection of it by suit. But it is not necessary to determine this question. We are satisfied that the boiler company knew of the particulars of the transaction as it occurred. Moreover, it received the money borrowed, and gave no sign of repudiating the means by which it had been obtained. It knew, and Griffin, the assignee, knew, that Linyard was for a considerable period endeavoring to sell the pledge, and no objection to his want of authority to make such sale was interposed. In these circumstances, it is evident that it cannot now be heard to disavow the terms of the contract by which it borrowed the money. Wilson v. Pauly, 18 C. C. A. 475, 72 Fed. 129, and 37 U. S. App. 642. It is further argued in support of this denial of authority that the power to sell without notice, if such power was given, did not include the power

to sell without demand; but as we reach the conclusion, stated in discussing another branch of the case, that a sufficient demand was made, in the circumstances, we need not follow the subject further in this connection.

2. It is insisted by the boiler company that Woodbridge, who made the sale to McDougall for Linyard, is not proved to have had authority from Linyard to make it. But, while it is true that there is no direct proof of his appointment as agent, it appears that he had for some time previous to the sale been acting professedly for Linyard in trying to realize the debt from the sale of the collateral, and further that, in making the disposition of it to McDougall, he acted upon an assumption of authority from Linyard, in whose name he made the sale. The latter came into the suit in 1894, and has continued to be a party since, although only nominally such since the sale to McDougall in 1896. The circumstances are such that it must be assumed that he was aware of the sale of the boiler company's contract to McDougall, and from his acquiescence in it, and his failure to raise any objection to the decree of the court disposing of the proceeds to McDougall, either before or after the decree was entered,—undoubtedly with his full knowledge,—we think it may be fairly inferred that he recognized the sale as one made for him, and that he must be regarded as having ratified it. Clearly, he would be bound by the orders and decree of the court in the suit to which he has been a party; and one of those orders was that permitting McDougall to file the supplemental bill, which was based upon the acquisition of Linyard's rights. We therefore think there was no error in holding the transfer to have been duly made, so far as the question of the authority to make it is concerned.

3. The next ground taken by the boiler company is that the sale of the pledge by Linyard was prematurely made. It is contended that it nowhere appears that the sale was made before demand for payment upon the ground that the pledgee regarded the security as depreciating in value. We know of no rule requiring the pledgee to make a formal announcement of the reason on which he exercises his power, if notice thereof has not been stipulated for in the contract by which the pledge is made. In this case notice of the sale was expressly waived by the pledgor, and it would not be unreasonable to hold that such a waiver was broad enough to include notice of the reason for making it. There is abundance of evidence to show that the pledgee might reasonably have regarded his security as depreciating. It was the subject of a litigation which had already been protracted for several years. It was being persistently defended, and costs and fees were accumulating. He had for some time been trying, without success, to dispose of his collateral, and had offered it for considerably less than the amount due him on his note, and the boiler company had become insolvent. We are disposed to believe that Linyard, in these circumstances, regarded his security as depreciating, and we think he would have been justified in selling the pledge on that ground. But we are also of opinion that sufficient had transpired to effect the maturity of the note.

It is insisted for the boiler company that no formal demand for

payment of the note is shown, and that, as it was made payable five days after demand, it had not matured. It is no doubt quite elementary that the general rule applicable to an instrument thus drawn is, as contended, that demand of payment must be made, in order to fix its maturity. But an express demand, in explicit terms, is not in all cases necessary. If the payee signifies to the maker, and clearly makes known to him, his desire for payment, in such manner as to be the equivalent of a request, that is sufficient. A note in this form is held to be overdue after the lapse of a short period, varying, as held by the reported cases, from one to a few months, the presumption being that demand has been made, and payment refused; and upon this presumption the instrument is treated as dishonored. Here the note had been outstanding for more than three years. The boiler company had nothing with which to make payment, all its property having been assigned to Griffin; and Woodbridge, who had charge of the claim for Linyard, was for several months in communication with Griffin, seeking to make collection. He offered to take $11,000 for the collateral. Griffin entertained the proposition, and tried to raise the money. In 1894 Linyard had intervened in the suit, to which both the boiler company and Griffin were already parties; alleging nonpayment of the note, and praying to have the proceeds of the suit on the collateral applied in satisfaction of his claim. The boiler company and Griffin answered, admitting the substance of Linyard's bill, and stating that when the sum due from the railroad company was realized the claim of Linyard should be paid. The note itself had been sent to the boiler company as early as October, 1892, for the purpose of getting payment out of the contract pledged, and that company put the papers in the hands of Bisbee for the collection of the amount due Linyard. A formal demand upon the boiler company would have been wholly futile. We cannot doubt that there was in all these circumstances the equivalent of a demand, and that the note must be regarded as having been long past due when Linyard sold his pledge in 1896.

4. Another contention made for the boiler company is founded upon these facts: There is evidence tending to prove that McDougall's purchase was in the interest of one Billings, who was at the time of the purchase the owner of the large majority of the stock of the railroad company, and had also had a controlling interest in that company from its formation,—covering, of course, the date of the contract with the boiler company; that Billings had promised the railroad company to provide sufficient funds to meet its liabilities, among which was that of the boiler contract; that instead of doing this he caused to be set up what is alleged to have been a fictitious defense to the boiler company's suit; that by being kept out of the money due on the contract the boiler company became embarrassed, and, being unable to pay its debts, was obliged to make an assignment for the benefit of its creditors; and that this was the reason why it could not pay its debt to Linyard, and occasioned the sale of the collateral to McDougall as agent for himself. It is upon this proof alleged that Billings by false and fraudulent practices brought about the conditions which compelled the sale, and having

effected it, and taken the benefit to himself, he became a trustee ex maleficio. But it is hardly conceivable that Billings could have been inspired by any such motive at the time when the contract for the boilers was made. There were no circumstances then which indicated that any such scheme was possible. The defense which the railroad company interposed was one which, if well founded, it was proper and competent for that company to make; and it appears that, upon full proof of the facts, the court was so much in doubt that a reference was ordered to lay the foundation for a decree that the contract was in fact such as the railroad company alleged it to have been. And, on looking into the evidence in the record, we are unable to say that it is at all clear that there was no fair ground for the defense, and that it was falsely interposed. Certainly there is no such preponderance of evidence leading to that conclusion as is required of one who charges another with a fraudulent motive. The charge in this instance seems mainly to rest upon the fact that the defense was not sustained by the court, for we find not much else to support it. Further, there is no proof that Billings made any promise to the boiler company that he would pay for the boilers. Indeed, it is clear from the record that the only promise, if it was such, which Billings made of the kind alleged, was a promise made to the railroad company. Confirmation of this is found in the fact that the boiler company has never attempted to hold Billings upon any obligation directly to itself. If, therefore, Billings failed to fulfill such an obligation, as the evidence possibly indicates, it was a matter in which the railroad company alone was concerned. And besides it is not proved that the defense was undertaken because of a lack of funds to pay the railroad company's debt. Up to about the date of McDougall's purchase there is nothing of consequence to show that Billings had conceived the purpose of making it. Our opinion of the probability is that Billings, being quite sure that there would, in any event, be a decree for a larger amount than Linyard's debt, thought it a good speculation for him to buy the collateral, and planned to do so. And we can find no reason for saying that he had not the same privilege to buy it as any other person had. He was in no trust relation to the boiler company, and a sale to him would not put that company in any worse position than a sale to any other person. It may be (though it is a question which we are not required to decide) that the railroad company, by virtue of his relation to it, could claim that the purchase should be held to have been made in its interest, and thereupon hold him as trustee. But that is another matter. It is clear that he stood in no such relation to the boiler company. In the case of Angle v. Railway Co., 151 U. S. 1, 14 Sup. Ct. 240, which is much relied upon by the appellant, two very essential facts existed, which, as has been shown, did not exist here. The first and most important one is that in that case there was an unlawful conspiracy between an intervening stranger and the managing officials of the debtor company to defeat the plaintiff's contract; and, in the second place, it involved the abstraction of all the debtor's assets out of which his claim could be collected. Stripped of these features, the case has little resemblance to this. For

these reasons we think the boiler company's claim must fail. The sale by Linyard conveyed the whole of the company's interest in the contract. Trust Co. v. Young, 4 C. C. A. 561, 54 Fed. 759, and 6 U. S. App. 469; Atlantic Trust Co. v. Woodbridge Canal & Irrigation Co., 86 Fed. 975, 982; Wade v. Railroad Co., 149 U. S. 327, 13 Sup. Ct. 892. Its insolvency was the cause of its loss of the pledge, and there is nothing shown in the conduct of the other parties which is sufficiently proximate to its misfortune to make them responsible for it upon any recognized doctrine of law or equity.

The appeal in respect to the claim of Griffin stands upon these facts: Griffin was the assignee of the boiler company. In the progress of the suit in which he intervened after the assignment, he incurred certain traveling and other expenses in giving his attention thereto. For the amount of these he makes claim upon the fund. He has already been reimbursed from the assets of the boiler company. The circuit court held that he was not entitled to maintain this claim, and we are of opinion that this conclusion was right. Under the general rule of law, the expenses incurred in enforcing the pledge must be borne by the pledgor (Gregory v. Pike, 15 C. C. A. 33, 67 Fed. 837); and, if the pledgee is compelled to pay them in the first instance, he has his remedy over against the pledgor. But here the pledgor had already instituted the suit in its own behalf at the time of the pledge, and it thereafter continued to prosecute it by its own counsel. After the assignment to Griffin he came in, and the suit was prosecuted by them jointly. It was thus prosecuted in their own interest; the purpose being to reduce the claim to judgment, and thereupon to obtain the proceeds after paying the sum for which it was pledged. They retained the control of the suit, and the only object of Linyard's intervention in 1894 was to obtain standing ground in the court, upon which he could be recognized when the fund should be brought in. This was the whole consequence of his intervention. It was an episode which formed no part of the main proceeding in the case. We can discover no ground upon which Linyard's pledge could be burdened with the expenses of the boiler company, or later of the assignee, in reducing the claim to judgment by a suit brought and controlled by itself for its own purposes. If such a claim could be supported, it is obvious that the costs might absorb the pledge, and leave to the pledgor the surplus intact.

McDougall appeals from that provision of the decree which allowed to Bisbee and Metcalf & Walker their claim for professional services in the case, fixed at $3,000, and their expenses in rendering such services, amounting to $131.70. The allowance of this claim is resisted on two grounds: First, because, as is urged, the lien of the solicitors had not become fixed on the 6th day of January, when the sale to McDougall took place; and, second, because they have denied and resisted the demand of the true owner of the claim. In respect to the first ground, it appears that the solicitors above named filed the original bill in behalf of the boiler company. When Griffin, the assignee, joined, they continued to represent the parties complainant; and this was their position in the case at the time of, and subsequent

to, the filing of the intervening petition of Linyard. He took no step to displace them, but in effect allowed them to continue the prosecution of the suit; his intervention being, as already indicated, simply to obtain a foothold in the case, and be in position to demand the recognition of his rights when the proceeds of the decree should be paid in. At the date of the entry of the decree they were still the solicitors for the complainants. McDougall's purchase was made on the 6th of January. The opinion of the court, announcing the final determination of the merits of the case, was handed down on the 17th. McDougall filed his application for leave to intervene on the 25th. The court denied the application for the time being, and on the 31st of the same month entered the final decree, in accordance with its opinion filed on the 17th, in favor of the original parties complainant, and against the railroad company. McDougall was thereupon allowed to intervene. Whether the court was influenced in some measure in delaying the allowance of McDougall's intervention by the purpose to preserve the lien of the solicitors upon the fund, does not appear. But, if it was, we think it was not improper. These solicitors had carried on the contest from the beginning, and had brought it to an altogether successful result. The professional labor in the case was substantially ended, and the fruits of their service were already in sight. The litigation was ended, and nothing remained but the formal entry of the conclusion already declared by the court. If there were anything in the circumstance that the decree had not been entered when McDougall presented his supplemental bill, and applied for leave to intervene in the suit, even if the court had then allowed it to be done,—a point we do not decide,—it was a bare technicality; and McDougall has no equity to complain that the court did not allow him at the nick of time to stand in and prevent the formal act which would fix the lien. By the law of Tennessee, attorneys and solicitors have a lien upon the recovery, whether by judgment or decree, for their services in the case. Hunt v. McClanahan, 1 Heisk. 503; Perkins v. Perkins, 9 Heisk. 95; Damron v. Robertson, 12 Lea, 372; Roberts v. Mitchell, 94 Tenn. 277, 29 S. W. 5; Brown v. Bigley, 3 Tenn. Ch. 618. The assignee of a judgment takes it subject to the lien. Cunningham v. McGrady, 2 Baxt. 141. And although it does not appear that the question has ever been considered by the supreme court of that state whether the same rule would apply to the expenses incurred in rendering such services, we can see no reason for a distinction. The labor and the money expended are equally the property of the lawyer, and alike necessary to the prosecution of the suit. In substance, they are intrinsically connected,—the service, and the expenses incurred in rendering it. The other reason assigned for the rejection of this claim is that the solicitors have denied, and continue to deny, the right of the true owner of the decree. The basis of this allegation consists in the fact that as solicitors for the complainants they have adhered to their clients, and have presented and urged the claims of those clients to the decree, or some part of it. There was no departure from duty in this. It was hardly to be expected that upon such an issue they would go over to the opposite party. The

rule relied upon, that the lien is lost by hostile action towards the owner, rests upon the assumption of a repudiation of his duty by the attorney, and has no application to the present case. The solicitors did not have their lien by virtue of any relation to Linyard or McDougall, but upon the ground that they had prosecuted the suit for the recovery of this fund to a final decree for parties entitled to maintain it. There was no error in sustaining this claim.

None of the assignments of error being sustained, the decree appealed from is affirmed. McDougall will recover his costs on this appeal and in the court below against the boiler company and Griffin, as between those parties, and Bisbee and Metcalf & Walker will recover their costs against McDougall in this court and in the court below.