CITY OF LAPORTE, IND., v. NORTHERN TRUST CO. et al.

(Circuit Court of Appeals, Seventh Circuit. January 3, 1911.)

No. 1,618.

1. LIS PENDENS (§ 13*)—CONSTRUCTION OF STATUTE—ACTIONS AFFECTED.

The lis pendens statute of Indiana (Burns' Ann. St. 1894, § 327), providing that "whenever any person shall have commenced a suit to enforce any lien upon, right to or interest in any real estate, upon any claim not founded upon an instrument executed by the party having the legal title to such real estate, as appears from the proper records of such county and recorded as by law required, it shall be the duty of such person to file a written notice," etc., does not apply to suit on behalf of taxpayers to enjoin alleged illegal action of a city council in attempting to increase the city indebtedness, which is governed by the common-law rule as to lis pendens.

[Ed. Note.—For other cases, see Lis Pendens, Cent. Dig. § 23; Dec. Dig. § 13.*]

2. LIS PENDENS (§ 25*)—PERSONS BOUND BY JUDGMENT—MORTGAGEES OF CORPORATION.

The general rule of lis pendens that all persons dealing with property are bound to take notice of a suit pending with regard to the title thereto, and will at their peril purchase the same from any of the parties to the suit, is subject to exception in case of negotiable securities purchased before maturity and articles of ordinary commerce sold in the usual way; but such exception rests on grounds of public policy due to the transitory nature of the property, and does not extend to a corporate mortgage given to secure bonds, whether by a strictly private or a public service corporation, covering real estate or chattels affixed to realty, which is gov-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

erned by the general rule, and all rights thereunder are subject to the issue of a suit affecting the property pending at the time of its execution.

[Ed. Note.—For other cases, see Lis Pendens, Dec. Dig. § 25.*]

3. LIS PENDENS (§ 25*)—OPERATION AND EFFECT—MORTGAGE MADE BY CORPORATION PENDENTE LITE.

A city owning a waterworks plant, but at the time without a supply of water suitable for domestic use, and being unable because of the constitutional limitation on its indebtedness to build an extension to secure an adequate supply, passed an ordinance by which it granted to a water supply company organized for the purpose the right to lay pipes through the streets and public grounds to its reservoirs, and to build a pumping station on its waterworks site, and contracted to buy from the company for a term of years a stated number of gallons of water per month delivered in its reservoir, and also to purchase $30,000 worth of the company's stock. The company agreed to procure an adequate supply of pure water from a designated source outside of the city, purchase right of way, and construct works and pipe lines to bring the same to the city. After the passage of the ordinance suit was brought by taxpayers against the city, its officers, and the water supply company to restrain the carrying out of the contract or the issuance of bonds by either party, but a preliminary injunction having been denied, the city issued and sold bonds for $30,000 and paid it for stock of the company, with which, together with the proceeds of bonds issued by the company, secured by mortgage on its property, the extension was made. The city then purchased for $10,000 the remaining stock of the company from the contractors to whom it had been issued, and who were also the incorporators of the company, and the city operated the entire plant. By final decree in the taxpayers' suit subsequently entered it was adjudged that the ordinance and contract of the city were ultra vires and void, as having been made pursuant to a fraudulent scheme devised by the city officers and contractors to evade the constitutional limitation upon the indebtedness of the city, and enable it to build and own the waterworks extension, which was paid for entirely by the city and from the proceeds of the bonds issued by the company, and the city was enjoined from making any further payments under the ordinance or upon the bonds of the water supply company. *Held* that, under the rule of lis pendens, such adjudication was binding on the mortgagees of the company, and was conclusive against their right to recover from the city on the bonds or to foreclose on the pumping works or pipes of the company which were located on city property or in its streets, and which constituted permanent improvements thereon made without right, but that the same adjudication determined that the city never acquired any right or title to the property of the company outside of its limits, legal or equitable, which was therefore subject to the mortgage.

[Ed. Note.—For other cases, see Lis Pendens, Cent. Dig. §§ 47–57; Dec. Dig. § 25.*]

Baker, Circuit Judge, dissenting in part.

Appeal from the Circuit Court of the United States for the District of Indiana.

Suit in equity by the Northern Trust Company and Arthur Heurtley, trustee, against the City of Laporte, Ind. Decree for complainants, and defendant appeals. Modified.

The city of Laporte appeals from a decree of foreclosure, in favor of the appellees, as trustees under a mortgage executed by the Laporte Water Supply Company, an Indiana corporation, against the mortgagor and the city of Laporte, impleaded as defendants in the bill filed by the appellees. The mortgagor suffered default, but the city of Laporte filed an answer contesting the validity of the mortgage, which covered a plant made and used for supplying

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

water to the system of waterworks established and owned by the municipality. On reference to a master, voluminous testimony was heard and reported by the master, with findings of fact and conclusions of law, which were confirmed by the trial court, upon hearing of the report and exceptions thereto filed on behalf of the city, resulting in the foreclosure decree appealed from, made applicable only to the tangible property owned by the mortgagor. It is provided in the decree that it "shall not be held to cover any intangible property herein mentioned, if any, which was never the property of the Laporte Water Supply Company," and that "nothing is determined or shall be deemed determined, as to the validity of so much of the ordinance contract adopted by the" city of Laporte, as purports to bind the city to pay "the hydrant rentals in said ordinance specified." The ordinance referred to, under which the mortgaged plant was constructed and operated, as an auxiliary system of water supply, reads as follows:

"An ordinance granting to the Laporte Water Supply Company the right to construct and maintain a system of waterworks for the purpose of furnishing water to the city of Laporte and its inhabitants.

"Whereas the present water supply of the city of Laporte is impure, unwholesome and unfit for domestic uses, and is insufficient in quantity to supply the needs of the city and its citizens, therefore, be it ordained by the common council of the city of Laporte, Ind., that,

"Section 1. There is hereby granted to the Laporte Water Supply Company, and its assigns, the right and privilege to erect, maintain and operate for the period of 21 years from and after the passage of this ordinance, a waterworks system in and near the city of Laporte and in connection therewith to erect and maintain for said period a pole line and to place thereon the necessary cross arms and wires for the transmission of electric current for power and telephone purposes connecting its pumping station with its source of supply and its city office.

"Sec. 2. The waterworks system shall be constructed in full compliance with the plans and specifications on file in the office of the city clerk, and work thereon shall be commenced within 30 days from and after the passage of this ordinance, and the same shall be in full and complete operation and ready to supply water, delivered in the Lily Lake reservoir of the city of Laporte, within six months thereafter.

"Sec. 3. Said works shall be of sufficient capacity to furnish 3,000,000 gallons in 24 hours when working to their full capacity. The water shall be obtained from an open reservoir supplied by a well, or wells, located on section 28, township 37 north, range 2 west, Laporte County, Indiana.

"Sec. 4. The city of Laporte hereby grants to the Laporte Water Supply Company the right to occupy during the term of the franchises hereby granted a tract of land adjoining its present water works pumping station near Lily Lake, sufficient to permit the erection of the necessary building for the installation of the necessary boilers, engines, pumps, electric generators and all necessary appliances to fully equip said system for operation; and there is hereby granted the right to lay mains and erect said pole line from said Lily Lake pumping station to said source of supply through the water works park of the city of Laporte and through the necessary streets and alleys of said city.

"Sec. 5. In consideration of the erection of said waterworks system, and of the furnishing to the city of Laporte of wholesome water, the city of Laporte hereby contracts and agrees to purchase at least 30,000,000 gallons of water during each calendar month during the period of the franchise hereby granted, the same to be delivered in said Lily Lake reservoir over a meter. The city of Laporte hereby agrees to pay for the water furnished by said company under this section at the rate of three cents per thousand (1000) gallons, and in addition to supply said company the necessary live steam from its said waterworks pumping station delivered at sufficient pressure to operate the machinery and pumps of said company to their full capacity. Payments for water furnished hereunder shall be made semiannually on the first day of January and July of each year. But it is expressly understood that the city of Laporte shall only pay for such an amount of water as is actually delivered in its Lily Lake reservoir and as it is furnished, and that said com-

pany's obligation to furnish water hereunder continues only so long as payment therefor shall be promptly made as herein provided for. The city of Laporte hereby pledges the income and revenue of its waterworks system for the payment of water rentals accruing hereunder. And in addition it agrees to annually, in due time, manner and season levy a tax sufficient to amply supplement said income and revenue so that at all times the said water rentals shall be promptly paid. In the event that the company shall issue bonds, the city of Laporte agrees to pay the rentals herein provided for to the trustee for said bonds, as may be directed by the company.

"Sec. 6. The city of Laporte reserves the right to purchase the waterworks system hereby authorized within ten days of completion for the sum of $97,-850. And in the event of such purchase the company shall convey to the city said waterworks system on payment of purchase price therefor less the amount of indebtedness of the company secured by mortgage of the system.

"Sec. 7. In case the company is delayed in procuring the necessary right of way, or source of supply, or in the event that it shall be enjoined from proceeding under this ordinance, or in the event that this ordinance shall be questioned by proceedings in court, then in either of such cases the time for the completion of said waterworks system shall be extended for a period equal to the time of such delay, or to the time such proceedings are pending.

"Sec. 8. Wherever in this ordinance the Laporte Water Supply Co. is named, or understood, the same shall be construed to mean and indicate said company, its successors and assigns.

"Sec. 9. The franchises herein granted shall not be in force unless the Laporte Water Supply Co. shall file with the city clerk its acceptance in writing of all the terms and conditions hereof within 20 days after the approval of this ordinance.

"Sec. 10. This ordinance shall be in force from and after its passage, approval and publication."

This ordinance and proceedings thereunder arose under the following conditions: Waterworks had long been established by the city, on the bank of Lily Lake, within the city limits, and the entire supply for municipal uses and distribution to the inhabitants was drawn from that small body of water and contiguous small lakes; but this water was not potable, and for drinking purposes private wells were the only source of supply. Thus it was well recognized that public supply for domestic purposes, from another source, was needful, and upon petition of taxpayers the common council had submitted the question of an extension of the waterworks to that end, for vote by the electors, resulting in a majority favoring such undertaking. Thereupon plans were made and bids taken for extension of the works, but it turned out that the cost thereof, under the lowest bid, was beyond the ability of the city to incur as an indebtedness under the limitation fixed by the Constitution of Indiana. So the scheme involved in the present controversy was adopted under the foregoing ordinance.

The Laporte Water Supply Company was incorporated, under the general statutes of Indiana—with the members of the firm which had made the lowest bid for the work as incorporators—vested with suitable powers for the undertaking and with $75,000 named as the capital stock, and the provisions of the ordinance were formally accepted by such corporation. It obtained title to the lands referred to outside the city limits, for pumping station, wells, and pipe line, and constructed the various works and pipe lines provided and intended by the ordinance, both on the above-mentioned lands and within the city, whereby connection with the municipal waterworks system was established. Thereupon the required supply of potable water was and is furnished for distribution by the city from and through its system. The buildings and machinery erected by the company within the city occupy lands owned by the city for the purposes of its waterworks, and the engines thereof are supplied with live steam from such works, in conformity with the provisions of the ordinance.

All proceedings and facts in evidence are undisputed, and the various exceptions filed to the master's report (on behalf of the appellant) are directed solely to his deductions of law or fact, leaving uncontroverted the portion of

such report entitled "findings of fact." Other facts thus appearing, in so far as deemed essential, are either stated in the ensuing opinion or summarized as follows:

The ordinance above recited was adopted August 7, 1899, for an extension of the waterworks of which the cost was named at $97,850. At that date the city was otherwise indebted for an amount which left a margin slightly in excess of $30,000 for which it could incur indebtedness, within the constitutional limitation, and the inhibition was plain against contract liability for the cost of such extension. Another ordinance was adopted by the common council—originally on August 7th, but amended as to the rate of interest and passed and approved August 14, 1899—providing for an issue of municipal bonds, to raise $30,000 to pay for like portion (300 shares) of the capital stock of the Water Supply Company, and authorizing subscription on behalf of the city for such shares of stock. This fund was raised, paid over to the use of the company, and 300 shares of stock were issued and received therefor. Wheeler & Co. (bidders for the work) entered into contract with the Water Supply Company to make the extension provided under the ordinance for $30,000 in cash, $35,000 in stock, together with $60,000 in bonds to be issued by the company, secured by mortgage. Thereupon Wheeler & Co. received the amount paid in by the city, and the Water Supply Company issued and delivered the mortgage and bonds referred to for use of Wheeler & Co. in performance of the work. These instruments were immediately marketed and the proceeds so used by Wheeler & Co.—the bonds in suit being the unpaid portion thereof. The total number of shares of stock issued by the Water Supply Company was 700, and Wheeler & Co. received 400 of such shares, making no cash payment for any part thereof, so that their only contribution to the capital stock was through their performance of the above mentioned construction contract.

Pending proceedings under these ordinances—and prior to the making of the construction contract or execution of the bonds and mortgage in suit—on August 26, 1899, a suit was commenced by one Scott and other taxpayers of the city against both the city and the Water Supply Company and the city officials to restrain issuance of bonds by either party and other proceedings thereunder. This suit was prosecuted (see Scott v. City of L. porte, 162 Ind. 34, 68 N. E. 278, 69 N. E. 675) and resulted in a decree against such defendants, which is set up as res adjudicata against the validity of the mortgage in suit herein.

After completion of the work, Wheeler & Co. sold and transferred to the city of Laporte all their shares of stock in the Water Supply Company for $9,950. On May 2, 1900, "the city of Laporte entered into possession of the property of the Water Supply Company and thenceforth operated it as a part of the waterworks system of the city." During such occupancy the city paid 12 of the outstanding mortgage bonds so issued by the Water Supply Company, but ceased further payments thereof, when a decision in the above-mentioned Scott Case was rendered, on its appeal to the Supreme Court.

Addison C. Harris and Norman F. Wolfe, for appellant.

Miller, Shirley & Miller and Wood & Oakley (W. H. H. Miller and Horace S. Oakley, of counsel), for appellees.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

SEAMAN, Circuit Judge (after stating the facts as above). The decree from which the city of Laporte appeals grants foreclosure relief in favor of the appellees, as trustees, under a mortgage made by Laporte Water Supply Company, an Indiana corporation, securing bonds issued by such corporation; and the relief is limited in terms to the tangible property owned by the mortgagor, as described in the mortgage and bill, without adjudication "as to the validity of so much of the ordinance contract" therein referred to as purports to bind the city of Laporte to pay "the hydrant rentals in said ordinance specified."

This property consists of a pumping station and appliances, wells, and pipe line constructed by the Water Supply Company on lands owned by the company, not within the city limits, and other works within the city of Laporte, constructed by the company on lands owned by the city for its waterworks, together with connecting pipe lines and appliances in intermediate highways of the city, for delivery of water from the wells of the company to the system of waterworks owned by the city, furnishing the inhabitants suitable drinking water, for which the existing supply of the city was unfit. These works were provided under and in conformity with the terms of a purported ordinance adopted by the common council to obtain such supplemental and needful supply of water, and the findings of fact, reported by the master and confirmed by the trial court, in respect thereof are unchallenged. Exceptions were filed to the report on behalf of the city, which raise issue only upon failure or refusal therein to deduce and find from the facts stated, in effect, fraudulent conduct of the contracting parties in all provisions for the work and invalidity of the ordinances and arrangements. The several assignments of error rest on like propositions, which are well classified in the argument of counsel for the appellant, as follows:

(1) That the ordinance referred to "was a mere sham, invented by the city officers and Wheeler & Co.," contractors for the work, "to hide the illegality of the transactions, and by indirection do what the laws and Constitution of Indiana prohibited," with "incorporation and use of the Supply Company" as a mere "dummy."

(2) That an adjudication accordingly, which appears in a suit commenced by taxpayers before the mortgage was made, is conclusive of such invalidity, as against the appellees.

(3) That "the machinery and appliances were put in as an enlargement and extension and as a part of the city waterworks plant, to be used and are in use by the city, and are not subject to be sold and torn out of the plant."

The mortgagor, Laporte Water Supply Company, is a corporation organized pursuant to the general laws of Indiana, for the purposes named in its articles, which embrace the establishment and operation of "a waterworks system in and near the city of Laporte" and authority "to vend water to the city"; and its incorporation was plainly within the provisions of the statute referred to, conferring the usual powers to acquire, hold, and convey corporate property. The contentions, therefore, of want of authority to construct and operate the works described in the decree, must rest on the alleged invalidity of the ordinances referred to and transactions thereunder, and not upon the further objection urged on behalf of the appellant that the plant thus provided was "merely an extension and enlargement of the city's own waterworks system," and that the statutes "do not authorize a corporation to be created to operate as a part of" such systems. It is settled by the findings that the works were constructed and used by the Water Supply Company as a "waterworks plant," to furnish a supply of potable water, for distribution by and through the waterworks system owned and operated by the city; and we believe its ownership and operation by the company, as an auxiliary plant for

such supply, would be consistent with the corporate powers vested in the company, nor would fair contract on the part of the city for such water supply be inconsistent either with the existing municipal provisions, or with the ruling in Scott v. City of Laporte, 162 Ind. 34, 68 N. E. 278, 69 N. E. 675, cited in support of the objection.

The mortgage in suit, covering the plant so constructed, was executed by the Water Supply Company, securing its negotiable bonds, which were marketed and the proceeds applied in performance of the construction contract; and the foreclosure decree involves only disposition of such property. Unless the facts in evidence disprove ownership of this property, in whole or in part, by the mortgagor company, and establish ownership in the city of Laporte, as of the date when the mortgage was delivered, we believe the mortgagees to be entitled to the equitable relief awarded by the decree. For reversal, however, the appellant contends, in substance, that the ordinances and proceedings throughout were fraudulent means, devised and carried out between the common council and city officials, as one party, and Wheeler & Co. (bidders and contractors for the work), as the other party, to build the works for and on the credit of the city—in violation of the constitutional provision against incurring municipal indebtedness—with the Water Supply Company incorporated and serving as a cloak or dummy for the city and having no actual interest in the undertaking, and that such fraud and invalidity are established, either (a) res adjudicata, in the case of Scott v. City of Laporte et al., or (b) under the undisputed circumstances in evidence. Thus the issue raised is not whether the ordinance provisions are enforceable against the city, nor whether the proceedings referred to were invalid in so far as they attempted to impose obligations upon the city, but it is limited to the inquiry whether contract relations and collusion between the parties to the undertaking are established, which affect and invalidate, in whole or in part, the mortgage of the plant, so issued by the Water Supply Company.

The defense of res adjudicata rests on a decree obtained by Scott and other taxpayers in their suit against the city of Laporte and executive officials thereof and the Water Supply Company, which was commenced August 26, 1899, after the adoption of the ordinance and before the Water Supply Company let the contract for the work or made the mortgage involved in the present suit. The original complaint alleged, in substance, a fraudulent scheme devised by the city officials and Wheeler & Co. to evade the constitutional inhibition referred to, through the ordinances of August 7th and incorporation of the Water Supply Company; that the city was to pay in $30,000 and the Supply Company was to issue bonds secured by mortgage for the remaining amount of the cost; that the Supply Company was not a bona fide water corporation, but was created merely for the purpose of constructing the work, without bona fide subscription for stock; and that the entire purpose was to construct the works for and on the credit of the city and create municipal liability both for its bond issue and for the amount of the bonds and mortgages made by the Supply Company. Its prayer is to have the ordinances and all contracts there-

under set aside and for injunctional relief against the defendants to prevent execution of the work, issue of bonds by the city or company for the purposes thereof, and for "further proper relief." An application for an injunction pendente lite was denied, both classes of bonds were issued, and the work was completed. Subsequently the complaint was amended, stating further facts tending to show that the city was to become the owner of all the stock issued by the Supply Company, and a supplemental complaint was filed, charging that the arrangement was carried out, by issuance and sale of both classes of bonds and by the taking over by the city of the stock issued to Wheeler & Co., with the Supply Company serving as a cloak or dummy for the city to incur the mortgage indebtedness. On the first trial of the issues raised by the answers of the several defendants, the complaints were dismissed for want of equity, but this judgment was reversed and a new trial ordered, on appeal to the Supreme Court—the opinion (162 Ind. 34, 51, 68 N. E. 278, 69 N. E. 675) upholding the right of the plaintiffs to enjoin performance under the ordinance, as an ultra vires undertaking on the part of the city. The ordinance provisions were there denounced (as we understand the opinion) as "an unauthorized undertaking to stand sponsor for the success of the enterprise," and an unreasonable attempt to bind the city, "for a term of years to buy, at a fixed price, at least a certain number of gallons per month," both purposes being beyond the municipal powers, so that the ordinance was invalid. But the question is expressly reserved therein whether the transactions violate the constitutional provision against incurring municipal indebtedness beyond the prescribed limit, as aptly averred in the complaint. On re-trial of the cause, however, the trial court (in conformity with the Indiana Code) made special findings of fact upon that issue, namely:

"That it was not the intention of the common council nor of the firm of W. H. Wheeler & Co. and the incorporators of the Laporte Water Supply Company or any one of them at the time of the acceptance of the proposal of said firm, the passage of said ordinance of August 7, 1899, and the acceptance of the terms thereof by said company, nor at any time, that said company or any of its incorporators should, nor did they nor any of them, provide, pay, or in any way contribute any money, pay for any stock subscribed by them, or provide any means in aid of the construction of said supply plant, or in any way maintain the waterworks of said city or supply it or its citizens with water otherwise than as contractors for the construction of said plant.

"That the said Laporte Water Supply Company was organized in further-ance of the combined purpose of said W. H. Wheeler & Co. and the common council of said city to evade the constitutional restriction upon the city to become indebted in a sum in excess of two per cent. of its taxable property, and its relation to said city was and ever has been that of its agent and serv-ant acting under the direction of its officers and common council and commit-tees, and as such agent and as trustee took and held the title of the land and right of way of said city on which said supply plant was constructed and in-stalled for the purpose of incumbering the same by the issuing of bonds in the name of said company and executing a mortgage or trust deed securing the said bonds."

The judgment thereupon reads as follows:

"It is therefore considered and adjudged that the ordinance of defendant city of Laporte of August 7, 1899, referred to in the complaint and findings herein, is null and void; that the defendants, their officers, agents and servants, and each

of them be and are hereby severally, perpetually enjoined from paying or making any payments upon, or appropriating, demanding or receiving money for the payment of, the bonds or interest thereon of the Laporte Water Supply Company, described in the finding and ·being an issue of $65,000.00 par value, dated ——— day of ———, or the debt hereby· attempted to be secured; and that said defendant city, its officers, agents and servants are hereby further perpetually enjoined from granting, giving or paying any money or thing of value to, or placing any of its funds at the disposal of, or paying any bills incurred, audited or authorized by' the defendant Laporte Water Supply Company or its officers, agents or servants; and said defendant Laporte Water Supply Company, its officers, agents and servants are enjoined from in any manner making any demand upon the defendant city for money, property or thing of value whatsoever."

The conclusiveness of this adjudication of the issue, as against the defendants there sued, is unquestionable. As the mortgage was issued by the Water Supply Company after the litigation was commenced, the mortgagees (appellees) were alike concluded thereby, under the common-law doctrine of lis pendens, unless their interest is exempt from such rule, either through the statutes of Indiana providing for lis pendens notice, or through the recognized exceptions from the rule at common law. The force of the judgment, therefore, hinges on the interpretation of one or both of these lis pendens rules; but, before passing to their consideration, two special objections raised by the appellees are overruled, namely: (a) That the above-mentioned suit was not prosecuted with diligence, after denial of the temporary injunction, and such delay, together with conduct referred to on the part of Scott, were indicative of abandonment of the litigation; and (b) that the original complaint was insufficient to authorize the findings or give notice of such purpose of the suit. We believe neither of these propositions to be tenable; that neither unreasonable delay appears in the prosecution of the suit, nor circumstances tending to impair its force—the denial of the injunction not being appealable under the Indiana practice—and that the amended and supplemental complaints were both authorized and competent for all such purposes, if it be assumed that the original averments were defective.

Is the statutory provision in Indiana for lis pendens notice applicable to the case? For answer to this inquiry it is conceded that article 73 of the chapter on "Civil Procedure" (1 Burns' Ann. Ind. St. 1894, § 327) contains the only provision on which such application may be predicated. It reads:

"Whenever any person shall have commenced a suit to enforce any lien upon, right to, or interest in any real estate upon any claim not founded upon an instrument executed by the party having the legal title to such real estate, as appears from the proper records of such county, and recorded as by law required, it shall be the duty of such person to file a written notice [as provided]."

We believe neither of the above terms of the' statute to embrace, in any sense, the nature or subject-matter of the Scott suit, which is filed on behalf of taxpayers, for injunctional relief against proceedings alleged to be invalid attempts to increase the municipal indebtedness, which must be borne by the taxpayers; and no decision thereunder is brought to our attention to sanction any interpretation to that effect. In conformity with the general rule in reference to like statu-

tory provisions for lis pendens notice (see Freeman's note on Lis Pendens, in Stout v. Phillippi Manfg. Co., 56 Am. St. Rep. 856), it is well recognized in Indiana that cases not within the statute remain subject to the common-law rule. First Nat. Bank v. Farmers', etc., Bank, 171 Ind. 323, 338, 86 N. E. 417; Rothschild v. Leonhard, 33 Ind. App. 452, 460, 71 N. E. 673. So the effect of the pendency of the taxpayers' suit must be ascertained from that source.

The general rule is well established and unquestioned "that all persons dealing with property are bound to take notice of a suit pending with regard to the title thereto, and will, on their peril, purchase the same from any of the parties to the suit." County of Warren v. Marcy, 97 U. S. 96, 105, 24 L. Ed. 977. Its expositions by Chancellor Kent, in Murray v. Ballou, 1 Johns. Ch. (N. Y.) 566, 573 (as applicable to realty), and in Murray v. Lylburn, 2 Johns. Ch. (N. Y.) 441, 442 (as applicable to a bond and mortgage or other personal property), have been accepted in this country, wherever the common-law rule obtains. As thus recognized and as upheld in County of Warren v. Marcy, supra, an exception is made to the rule in cases of "negotiable securities purchased before maturity and articles of ordinary commerce sold in the usual way." In Murray v. Lylburn, supra, it was held that "bonds and mortgages are not the subject of ordinary commerce," and are within the rule; and like doctrine is expressly pronounced and applied in Union Trust Co. v. Southern Nav. Co., 130 U. S. 565, 570, 9 Sup. Ct. 606, 32 L. Ed. 1043, and Mellen v. Moline Iron Works, 131 U. S. 352, 364, 370, 9 Sup. Ct. 781, 33 L. Ed. 178.

The appellees contend, however, that the mortgage in suit is entitled to exemption from the rule, notwithstanding these decisions, for the reason that it is made by a public service corporation, as security for the corporate bonds; that, under present day conditions, such issues are marketed and held, not only as negotiable securities, but as "articles of ordinary commerce," and should be so classed within the exceptions above stated; and that, were the harsh rule of lis pendens notice applied to such securities, it would destroy their inestimable value and importance in the trade of the country. For this distinction from the early rule of Murray v. Lylburn, counsel cites Railway Co. v. Lynde, 55 Ohio St. 23, 39, 52, 44 N. E. 596, and Farmers' L. & T. Co. v. Toledo, etc., R. R. Co., 54 Fed. 759, 772, 4 C. C. A. 561. The first-mentioned case appears to support the contention; and the opinion in the other case mentions that "a bona fide holder of negotiable corporate bonds is not subject to the general doctrine of lis pendens," but we do not understand the decision in the case to be predicated on that view. We are impressed with the importance of the basic question, whether securities thus issued and marketed, either individual or corporate, should be subjected to the lis pendens rule, but we do not believe the distinction above sought, in favor of securities issued by so-called public service corporations, authorizes exemption from the rule, under the established doctrine which must govern the case at bar.

The settled rule in reference to the immunity of negotiable notes and bonds in the hands of bona fide holders before maturity from matters of defense between the maker and payee does not affect the

present inquiry; nor the like rule applicable to the mortgage given to secure such commercial paper, leaving no equities open as to its procurement or execution. For title to the mortgaged property, however, the holder must make the needful examination and inquiry, and acquires no better title, in general, than that of the mortgagor at the date of the mortgage, except as he is protected by the recording acts applicable to such property. The doctrine of lis pendens—"that a lis pendens, duly prosecuted and not collusive, is notice to a purchaser so as to affect and bind his interest by the decree"—is of the last-mentioned nature and founded on public policy. It applies to property and interests in litigation over which a court has acquired jurisdiction, so that no intermediate transfer or incumbrance by either party can disturb the judicial control and ultimate adjudication thereof within the issues; and the rule is binding alike upon all parties, whether individuals or corporations, public or private. When the suit involves the title or property rights of a public service corporation, either in real estate or in chattels affixed to realty, we believe no sanction appears for exemption of such property from the rule merely upon the ground of its corporate nature, and that the contention therefor is untenable, unless exemption arises from the fact that the property is mortgaged to secure an issue of commercial paper.

The exemption from lis pendens notice of negotiable notes and bonds involved in a suit, either left in circulation or permitted to issue without restraint, and of "articles of ordinary commerce" which are the subject-matter of litigation, is well recognized as resting on grounds of public policy, with no applicability, as we believe, to the mortgaged property in question, nor to a suit involving right or title thereto. Immunity of the above-mentioned classes of personal property is due to their transitory nature, requiring either custodia legis or injunctional relief to preserve liability or status quo, while no such requirement or rule (in the absence of statute) is applied to real estate or fixed chattels and interests therein. In reference to such interests, we believe the doctrine to be established by the Supreme Court—directly in Union Trust Co. v. Southern Nav. Co., supra, and Mellen v. Moline Iron Works, supra, and inferentially under all the earlier cases—that lis pendens is binding upon a purchaser or mortgagee of the property, when the grantor or mortgagor is party to a suit which involves his right or title thereto; that no form of transfer by the party can affect the jurisdiction of the court over the subject-matter, whether the instrument is made to secure negotiable paper, or upon other considerations; and that the exception above referred to in favor of commercial paper is not applicable to a mortgage so made.

We are of opinion, therefore, that the general tests of lis pendens liability are applicable to the case at bar, namely, (a) the character of the mortgaged property, and (b) the issues involved in the pending suit. For the one test, the property described in the mortgage and decree, constituting a water supply plant, is plainly within the rule, as uniformly defined by the authorities. It consists of two portions— one of real estate outside the limits of the city, purchased and held in the name of the mortgagor, with wells, pumps, appliances, and water

pipes located thereon, and the other part of engines, buildings, appliances, and water pipes, located within the city, on lands owned by the city or in the streets thereof—so that either portion of the plant is of the class of property subject to such liability. The foregoing findings of fact in the Scott Case, as before stated, are within the issues there presented, so that the right and title of the mortgagor, Water Supply Company, in the premises, were directly involved therein, to the extent that such title rested on the ordinances and proceedings referred to or was affected by the facts, thus found; and in like measure the adjudication is binding, as we believe, upon the appellees, as mortgagees.

Under the conclusion above stated, it is not needful to review the evidence introduced in the present record, in support of like averments of collusion and fraud in the procurement and purposes of the ordinances and proceedings referred to, nor these contentions of appellees thereupon: (a) That the alleged fraudulent purposes are not disclosed in the terms of the ordinances or proceedings of record on the part of the city; and (b) that the mortgagees are not chargeable with notice of evidence aliunde showing such purpose and its consummation. With the lis pendens notice thus operative, it becomes immaterial whether the mortgagees are alike chargeable under other evidence.

The premise of fact is thus established: That the contracting parties undertook—the officers of the city to obtain, and the bidders, Wheeler & Co. to construct—the water supply plant, in despite of the recognized condition, that the city was prohibited by the Constitution of Indiana to incur indebtedness for the cost of such work; that they united in the scheme to incorporate the Water Supply Company as a holding concern, to be invested with an ordinance franchise and become the contractor for and nominal owner of the plant, and issue a mortgage to raise $65,000 required for the work, in excess of about $40,000 to be furnished by the city, within its powers; that the funds so provided by the city were to take the form of payments for capital stock in the Water Supply Company, with no payments made thereon by the incorporators, representatives of Wheeler & Co., and the city of Laporte was to become sole owner of the capital stock when the work was completed. These arrangements were carried out and the city (in such guise) entered into control of the plant, thus incumbered by the mortgage in suit, having contributed to the use of Wheeler & Co.—nominal stockholders and contractors for the work—the amount so applied as payment for stock. We believe the ordinance adopted for such purposes to be invalid, not only as res judicata, but under the settled doctrine in Indiana, in reference to like schemes to evade the constitutional limitation (see Voss v. Waterloo Water Co., 163 Ind. 69, 83, 71 N. E. 208, 66 L. R. A. 95, 106 Am. St. Rep. 201, and cases cited, and Eddy Valve Co. v. Town of Crown Point, 166 Ind. 613, 76 N. E. 536, 3 L. R. A. [N. S.] 684), and as well in other States (see Earles v. Wells, 94 Wis. 285, 293, 68 N. W. 964, 59 Am. St. Rep. 886; Water Works Co. v. City of Ironwood, 99 Mich. 454, 455, 58 N. W. 371; Browne v. Boston, 179 Mass. 321, 324, 60 N. E. 934) having like restrictions. As pointed out in these authorities, the

purpose of the limitation is violated, when property is taken by the municipality subject to a mortgage liability in excess of the limit, whether such liability is directly assumed or is indirectly incurred through such taking.

The effect, therefore, of invalidity of the ordinance, under which the plant was constructed, in reference to the relief sought and granted against the mortgaged property, remains to be ascertained; and its solution in the foregoing view is not free from difficulty. The plant is unitary in respect of its construction and service, as an auxiliary means of water supply for the pre-existing waterworks system of the city. For the present consideration, however, it requires apportionment into the two parts, having respectively several locations and sources of title. The engines, structures, and water pipes within the city are affixed to real estate, either owned by the city or constituting highways thereof, with no property right in such real estate vested in the mortgagor company, otherwise than through the invalid ordi-. nance. On the other hand, the wells, pumps, water pipes, and other structures outside the city are located on lands purchased and held in the name of the mortgagor company, so that title to such portion does not rest on any grant or provision of the ordinance, although constructed and placed in conformity with its purposes.

1. In reference to the property so affixed within the city, we believe these propositions must be upheld: The mortgagor entered as a party to the collusive arrangement between the assumed representatives of the city and the bidders for the work, for adoption and acceptance of the ordinance, all having actual or presumptive knowledge of the facts which rendered such action on the part of the city officials both unauthorized and void. Thus the terms of the ordinance (section 4) purporting to confer right of entry upon and use of the lands within the city was not only without force as against the city, but all parties were in pari delicto thereunder; and for the purposes of the present inquiry it is immaterial whether the purported grant be defined as an easement or otherwise. With no other muniment of title, no right of entry or use in other form, for placing the works thereon, all parties engaged in the transactions were without color of right and mere trespassers. We believe, therefore, that neither the mortgagor, nor the mortgagees chargeable with notice (as before stated), have equities in the premises, under the facts as adjudged, to authorize the decree in their favor. In substance it assumes to confer a right of re-entry (for enforcement of the decree), both upon the streets of the city, to excavate and remove the water pipe and other appliances therein, and upon the lands and buildings owned by the city, to dismantle and remove the other fixtures described in the decree. While the general doctrine is settled that the participants in violation of like constitutional provisions are not entitled to relief in equity against municipal property thus created (Litchfield v. Ballou, 114 U. S. 190, 194, 5 Sup. Ct. 820, 29 L. Ed. 132, 10 Notes U. S. Rep. 1048; Gamewell Fire Alarm Tel. Co. v. Laporte, 102 Fed. 417, 419, 42 C. C. A. 405), we do not rest our conclusion thereupon. At common law the rule is established in reference to permanent improve-

ments thus placed upon the land of another by one without either right or interest in the land, or consent of the owner, that no right of re-entry exists in favor of such tort-feasor to recover the improvements so annexed to realty (22 Cyc. 7, 8); and this property rule is well recognized as prevailing in Indiana, except as modified by statute for "improvements made in good faith and under color of title." Graham v. Connorsville, etc., R. R., 36 Ind. 463, 469, 10 Am. Rep. 56; McClarren v. Jefferson School Tp., 169 Ind. 140, 144, 82 N. E. 73, 13 L. R. A. (N. S.) 417. While distinction from the rule is upheld in the last-mentioned case, where improvements are made by a corporation invested with the power of eminent domain, no such departure is allowable, under either authority, in favor of the present tort-feasor or its mortgagees. We are of opinion, therefore, that the decree is erroneous, in respect of the above-mentioned property.

2. The remaining provision for foreclosure sale of the property held in the name of the mortgagor outside the limits of the city does not fall within the last-mentioned rule. It is contended, however, that the general doctrine above referred to is nevertheless applicable thereto in the twofold view (a) of the established relations of the parties to the transactions, and (b) the unitary character of the water supply works; and we are impressed with the seriousness of this objection under the settled facts. The insidious method which ultimately appears in the scheme for vesting in the city all property rights in the plant as an entirety, through its ownership of all the capital stock, marks the entire transactions as violative of the constitutional provision, alike with various methods of direct conveyance to the municipality of such property, subject to a mortgage, which are thus condemned by the authorities above referred to; and no doubt is entertainable that the parties to the arrangement—"participes criminis" therein (Litchfield v. Ballou, ante)—may rightly be excluded from relief in equity for enforcement thereof in any form. But assuming that the mortgagor, Water Supply Company, incorporated between such parties to issue the stock and hold the property thereunder, thereby becomes a party, alike subject to condemnation and disability, we are not satisfied that its exclusive corporate ownership and possession of the real estate, wells, and fixtures in question could be disturbed and taken, either in law or equity, for the benefit of the city. None of the authorities cited thus extends the effect of such participation, and we do not understand the adjudication in the Scott Case to charge any equities therein in favor of the city, nor that equities appear in this record which would justify such charge, to deprive even the mortgagor-corporation of its several ownership in favor of the city—laying aside such rights as may have accrued through its subsequent purchase of the capital stock. Although the findings in the Scott Case and as well in the case at bar show that the city paid in (for its original purchase of stock) $30,000 proceeds of the issue of city bonds, and that $65,000 was contributed by the sale of the present issue of Water Supply Company bonds, there is no finding in either case which is directed to or tends to prove that the real estate so purchased and improved by the company should be

187 F.—3

awarded to the city, in any equitable view of the investments respectively. It is true that no sanction for the undertaking can arise from the need of such water supply for the city nor out of the undoubted purpose of the officials thereof to subserve that requirement; that, however desirable the service may be, the powers of equity may well be exercised, not only to restrain municipal action to that end, from assuming liability (directly or indirectly) beyond the constitutional limit, but to prevent or set aside the consummation by parties thereto of such undertaking, whereby the limit is exceeded. So it is well recognized that equity will neither grant relief to the contractors therein for recovery of works thus placed upon the municipal property, nor for relief in any form imposing liability therefor. In other words, the constitutional limitation must be preserved and enforced in favor of the municipality against subversive efforts of its own officers and all contracting parties to create liability, but we do not understand that equity requires or permits relief in favor of the municipality to enforce the repudiated contract, or sequester and hold property of the contractor, which has not vested in the municipality. While the city may retain the benefits of the performance, in so far as work has been affixed to its property under the invalid undertaking of its officers, its holdings of stock in the Water Supply Company, as arranged with the original holders, cannot justly serve, without other equities, for sequestration of the works of the company not so affixed.

Whatever may appear to be the present relation and status of the mortgagor in the premises, however, we believe the mortgagees to be entitled to foreclosure relief in respect thereof, as granted by the decree. While they are bound, as we believe, by the adjudication against the validity of the ordinance, as unconstitutional in its purpose, and are thus left without title or equity in the property within the city predicated thereon, their rights in the other portion do not rest in any sense upon the ordinance. The real estate was purchased from the several owners for the Water Supply Company, and the title stands so vested in the mortgagor, with no right or interest possessed by the city, legal or equitable, apart from such rights as may be conferred by its purchase and ownership of the corporate stock; and the wells, pumps, pipe lines, and other fixtures were provided and placed thereon by such owner of the fee. So the complete property right thus vested in the mortgagor was conveyed under the mortgage, and the recording acts protect the mortgagees from adverse claims, except to the extent of the lis pendens notice. Neither that notice nor the ultimate decree therein (as before stated) purports to set aside the title thus acquired, and no disturbance thereof was made by the decree, beyond its injunctional provisions against payment by or demand of the city on account of the bonds and mortgage, and other liabilities attempted to be imposed. The invalidity of the ordinance is expressly adjudged, and in effect all obligation on the part of the city, express or implied under the scheme, are annulled; and that the pleadings in the Scott suit were interpreted by the Supreme Court as so limited, without force otherwise as against the mortgagees, ap-

pears from its opinion therein. It is there stated (page 42, 162 Ind., page 280, 68 N. E. [69 N. E. 675]):

"A corporation has in fact been created, which has negotiated its securities, and it is not alleged that the purchasers or the holders of such securities had any notice of the option agreement of August 21, 1899, which it is to be borne in mind was not of record. We shall therefore assume that whatever the city was endeavoring to do in the use that it was making of the Laporte Water Supply Company those who invested in the bonds of the city or the bonds of the Water Company had no notice of such purpose."

Moreover, without the statutory lis pendens notice (which would seem applicable to disturbance of such title), we believe no extension of the decree thereto would be authorized in any view of the scope of the supplemental averments. The adjudication, therefore, should be construed in conformity with such opinion, as directed to avoidance of the purported property rights conferred by the ordinance, together with all provisions in any form for obligation on the part of the city for use of the plant, without affecting the above-mentioned title to the other property.

It is true that both portions of the works were provided in conformity with the purposes of the ordinance, to be united for an auxiliary water supply to the city system, and that each became useless for such object when severed, so that both depreciation of their value and loss to the city of such means of water supply must result from severance, while the city is forbidden to contract for purchase or use of that source of supply. The city cannot, directly or indirectly, be charged with liability to take and assume payment for works so provided by the unlawful scheme entered into between its officers and the contractors, but, without other equities than appear in the record, we believe sequestration or other taking of this portion of the works from the mortgagees, for the benefit of the city, would be inequitable and unauthorized. The amount paid in by the city was within the constitutional limit, although the purpose was adjudged unlawful. If entitled, in any view, to be made an equitable lien or charge upon such portion, as against the mortgagor, it was not so made under the lis pendens, and the mortgagees (and bondholders) acquired the title without notice thereof otherwise. We believe, therefore, that the decree rightly grants foreclosure relief in respect of the property so held outside the city of Laporte.

The decree appealed from must be reversed for correction in conformity with the foregoing opinion, and the cause is remanded to the Circuit Court, with direction to modify and enter decree accordingly.

BAKER, Circuit Judge (dissenting). Agreeing, of course, that the pipes can physically be cut in two at the point where they cross the city limits, I do not see how that bears upon either the physical fact of the present integrality of the supplemental plant or the legal fact of the unsplitable nature of the taxpayers' asserted cause of action and the final decree thereon.

Plans for the construction of the new system as an entirety were agreed upon between the city officials and the contractors. Realizing that a direct contract between them would be futile, they determined

to attempt the same end under cover. The result physically was the construction of a unitary system in which the wells and pumps were outside the city; and the power for pumping the water from the wells, the reservoir for receiving the water through a continuous pipe line, and the means for distributing the water from the reservoir were within the city. With the pipe severed, and the pumps at one end and the power and the reservoir at the other end in the hands of adversaries, each part would be practically valueless in comparison with its value in the unitary system.

Before a step had been taken in the physical work, taxpayers filed a suit for injunction. This was an assertion that they were the true representatives of the city, and that the city officials had abandoned their posts and were about to trespass upon the city's rights. The charge in substance and effect was that the city officials and the contractors were about to attempt under cover what they could not do openly; that they had devised a scheme under which they would try to evade the Indiana Constitution; that the scheme consisted of organizing a corporation to act as agent and trustee of the city, of the corporation's never having funds in its treasury except what were to be obtained from the city treasury and what were to be borrowed by it as agent and trustee of the city, of the corporation's acquiring the naked legal title to a right of way from the wells to the city's water station and holding such title and possession thereunder as agent and trustee of the city as the real owner and possessor, of the contractors' building on such right of way the system according to the original plans and their original bid, of the contractors' stepping aside after receiving their money partly from the city treasury and the balance from a loan to be obtained by the corporation as the city's agent and trustee, of the corporation's securing the loan by executing as the city's agent and trustee a mortgage of the system as an entirety and then leaving the city as the actual owner, possessor, and operator of the plant and the real paymaster of the borrowed money; that the scheme had progressed to the point of organizing the corporation, passing the ordinance, and making the contract for the work; and that the entire scheme, unless enjoined, would be carried out to completion.

The facts being so, the decree, if rendered promptly instead of after years of litigation, would have stopped the scheme before a cent of the taxpayers' money was taken from the city treasury to put into an unlawful enterprise.

The final decree was that of the Laporte circuit court. Regarding the quoted expression from the Indiana Supreme Court, it suffices to say that the mortgagees were not before that court; that no party then before it did or could present an issue as to that suit's being or not being effective as lis pendens against the mortgagees; and that in the proceedings then before it the Indiana Supreme Court found error and remanded the cause for trial de novo. Thereupon it became the duty of the Laporte circuit court to hear the evidence, find the facts, draw conclusions of law, and enter a decree. The Laporte circuit court may well have concluded, the question of lis pendens not being

before the Indiana Supreme Court nor before it, that the statement looking towards that subject was not authoritative. But, if authoritative, what then? The finality of a decree, as against parties and privies, is not dependent on the court's correctly apprehending the scope of the authorities or even the law of the case.

When the Laporte circuit court came to formulate its final decree, it had to pass upon the original complaint and the supplemental complaint as well. The latter document made no change in the taxpayers' asserted cause of action. It merely exhibited a change in circumstances under which the injunction as originally prayed for would be ineffective. It charged in substance and effect that pending the suit the scheme had been executed; that money from the city treasury had been taken and used to buy the well site and right of way outside the city in the name of the corporation, but for the city as the real owner; that the contractors had completed the plant and stepped aside after getting the amount of their original bid partly out of city funds and the balance out of a loan procured by the corporation as agent and trustee of the city; that the corporation as agent and trustee of the city had mortgaged the plant as an entirety to secure the loan and had turned the plant over to the city subject to the mortgage. The allegations of the original and supplemental complaints were found to be true. The final decree therefore had to be framed to protect under the changed circumstances the taxpayers' rights as originally asserted. With findings of the fraudulent scheme as an entirety, of the fact that the formal corporation had been used throughout merely as a cover for the operations of the city officials and contractors, of the fact that the naked legal title to the right of way within the city and of the right of way outside the city (purchased with $600 or $700 of funds from the city treasury) was held by the corporation as trustee of the city, and of the fact that not a dollar ever went into the plant outside of $40,000 taken from the city treasury and $65,000 indirectly borrowed by the city through the corporation as its agent, it seems clear that a decree perpetually enjoining the corporation "from in any manner making any demand upon the defendant city for money, property or thing of value whatsoever" would forever preclude the corporation (no matter who should hold the stock thereof) from setting up any claim upon the water or other revenues of the city and also from disturbing the city in its ownership, possession, and operation of the plant as an entirety.

"Pendente lite nihil novetur" is a maxim of imperative policy. It therefore must override the individual's plea of hardship. If a defendant to an injunction suit (the res litigiosa being of the kind that is within the maxim) changes the status, even though there be no temporary injunction, he is in contempt of the court's jurisdiction. Such a course can earn him no rights; at most, it can only change the form of what would have been the final decree. An innocent investor, whether he takes his conveyance before or after decree, equally suffers if deprived of his investment; and the hardship is of the same kind, lesser only in degree, if but half is stripped from him. But if the suit is of the class, and the subject-matter of the kind, in which the max-

im applies, no exception in enforcement can be made where one comes in before decree any more than an exception could be made in the enforcement of the rule of res adjudicata where one comes in after decree. Enforcement of both, without regard to hardship, is an absolute requisite of government. This necessity is the foundation of the maxim. An effect is to create a constructive notice to the world.

Among the suits of which the world must take notice is the injunction suit that seeks to prevent acts affecting any kind of property except commercial paper or ordinary articles of commerce in the usual course of trade. Union Trust Co. v. So. Nav. Co., 130 U. S. 565, 9 Sup. Ct. 606, 32 L. Ed. 1043; Diamond v. Lawrence County, 37 Pa. 353, 78 Am. Dec. 429; Murray v. Lylburn, 2 Johns. Ch. 441.

"Lis pendens is notice of every fact contained in the pleadings and apparent on the face thereof, and of those other things of which the facts so stated necessarily put the purchaser on notice." Jones v. McNarrin, 68 Me. 334, 28 Am. Rep. 66; Lockwood v. Bates, 1 Del. Ch. 435, 12 Am. Dec. 121; and other cases cited in 25 Cyc. 1476.

The members of this court are in agreement that the mortgagees were bound to know that the Water Supply Company had no right to take money from the city or from them and put it into the construction of the water system on the right of way easement within the city, the legal title to which stood in the name of the Water Supply Company. But what were the infirmities of which the mortgagees had actual or constructive knowledge? Not that the Water Supply Company did not have a good charter from the state; nor that it was wanting in corporate power to take a grant from the city "to erect, maintain and operate a waterworks system in, and near the city of Laporte," and a grant from the city of a right of way within the city, and a grant from others of a right of way outside the city. The infirmities were that, although those things might be done in a proper case, in this case everything done or threatened to be done was an indispensable element of an illegal scheme which had for its sole aim the erection of the plant as an entirety and the turning over of it to the city subject to the mortgage; that the title to the easement within the city, though standing in the name of the Water Supply Company, was the city's title and would merge into the city's original title; that the needed right of way outside the city was to be bought with the city's money, and that the title, though standing in the name of the Water Supply Company, would be the city's title; that the city's money, to the extent of $30,000 or so, was first to be expended in putting a unitary system upon such lands; and that the city, through its agent, was to mortgage the plant for enough to finish it. The mortgage, when tendered to appellees, showed both the unity of the system and the unity of the plan by which the money was to be raised. The physical situation itself was notice of the integrality of the system.

If the complaint was notice to the defendants that any attempt by them to construct the system would be in contempt of the court's jurisdiction, then it was notice to anyone who was bound to take notice at all that no greater rights than the defendants would have could be obtained in the proposed system. If the decree is a final adjudica-

tion against the Water Supply Company, then it is a final adjudication against the Water Supply Company's mortgagees who were bound to know that such a decree might be rendered.

I admit, of course, that the Water Supply Company, solely by virtue of its franchise from the state to be a corporation, independently of its franchise from the city to build a waterworks system in and near the city, had the legal capacity to go out and buy lands with its own funds and place thereon a valid mortgage. The franchise from the city was just as valid on its face as the franchise from the state. But the actual physical undertaking, the proffered mortgage itself, and particularly the taxpayers' complaint were notice that it was the franchise from the city that was about to be exercised.

If, before the taxpayers' complaint was filed, the execution of the scheme had progressed to the point where the city's money had been used to buy the outside right of way in the name of the Water Supply Company, the taxpayers might have had to file the statutory lis pendens notice. But, if the complaint as filed gave the court jurisdiction of the res litigiosa and of all persons then interested in the res (the threatened exercise of the franchise from the city), no action of a defendant in contempt of that jurisdiction could diminish the court's authority on the original complaint to render a final decree that would forever conclude the defendants and all persons who were bound to take notice of the facts alleged in the original complaint.

The decree of this court strikes me as being of the same character as that of the Circuit Court. That decree, no less anxiously than this, professed to relieve the city of all liability, professed to enforce in favor of the taxpayers the constitutional prohibition of subversive efforts of city officers and all contracting parties to create liability. That decree eliminated the mortgage of the water rentals and the city's taxes, expressly excluded every demand against the city, and confined itself to ordering the sale of the tangible property into which the mortgagees' money had gone. Why was that decree, explicitly shutting out all personal liability on the part of the city, not permitted to stand? On account of the compulsive force of the situation. Because the only way the taxpayers could protect their underlying $30,000 or $40,000 tied up in the unitary plant would be to pay off the superimposed mortgage. The present decree is coercive in exactly the same way and nearly to the same extent. It puts into the mortgagees' hands the sword that Solomon held over the child. The only method by which the taxpayers can protect their underlying $30,000 or $40,000 (and the $22,000 paid on the mortgage by the city officers in the face of the taxpayers' suit) is to pay off the superimposed mortgage to the extent that the situation compels. The part within the city, if not used in a waterworks system, has only a junk value. To preserve the present value of the part within the city the taxpayers will be forced to pay to the mortgagees (before or at or after the judicial sale) an amount substantially equal to what it would cost them to put in new wells, pumps, and pipes to the city limits.

What more can taxpayers do to protect themselves against faithless municipal officers and eager contractors than to put into the state's

organic law an absolute prohibition of schemes such as this record discloses, and to begin promptly, before a dollar is embarked in the illegal enterprise, an injunction suit against all parties then concerned in the threatened betrayal?